# United States Court of Appeals
## For the First Circuit

Nos. 14-1227
     14-1250

UNITED STATES OF AMERICA,

Appellee,

v.

CHRISTOPHER S. GODFREY; DENNIS FISCHER,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, Chief Judge,
Thompson and Kayatta, Circuit Judges.

William J. Lovett, with whom Anthony E. Fuller, Melissa
Baldwin, and Collora LLP were on brief, for appellant Godfrey.
     Robert L. Sheketoff on brief for appellant Fischer.
     Stephan E. Oestreicher, Jr., with whom Carmen M. Ortiz, United
States Attorney, Adam J. Bookbinder, Assistant United States
Attorney, Mona Sedky, Attorney, Criminal Division, Leslie R.
Caldwell, Assistant Attorney General, and Sung-Hee Suh, Deputy
Assistant Attorney General, were on brief, for appellee.

May 26, 2015

**KAYATTA, Circuit Judge**.  In 2009, when many homeowners faced foreclosure, defendants Christopher Godfrey and Dennis Fischer started and ran a company that purported to sell mortgage modifications.  For a hefty price, the company actually sold a doctored version of a free government form.  Securing sales nationwide, company employees systematically lied to customers through personalized mailings and cold calls.  After the company bilked distressed homeowners across the country for almost two years, law enforcement officials came knocking, a grand jury handed down indictments, and Godfrey and Fischer were convicted of mail fraud, wire fraud, and misuse of a government seal, as well as conspiring to commit these crimes.

On appeal, Godfrey and Fischer challenge their convictions by advancing four arguments: (1) the district court violated their confrontation rights by admitting into evidence customer complaints and cease-and-desist letters from regulators; (2) the district court constructively amended the indictment by admitting evidence of their lies to the IRS and then allowing the jury to convict them based on those lies; (3) the district court erred in instructing the jury on the elements of the charged misuse of a government seal; and (4) the district court abused its discretion by not dismissing a juror for bias mid-trial.  Finding none of these arguments persuasive, we affirm.

# I.  Background[1]

In early 2009, the federal government started the Home Affordable Modification Program ("HAMP") to provide financial relief during the foreclosure crisis.  HAMP provided incentives for lenders to modify existing loans when homeowners had financial hardship and an ability to repay under new terms.  To apply for HAMP relief, homeowners filled out a Request for Modification and Affidavit form, available for free on the Treasury Department's website.  That form had a free counseling hotline number: the Homeowner's HOPE hotline (888-995-HOPE).[2]  Submission of the form simply started a process, the outcome of which was ultimately dependent on whether the applicant's lender approved a mortgage modification.  At some major banks, a mere ten percent of applicants received relief through the HAMP program.

Seeing a market for financial snake oil, Godfrey and Fischer founded a Florida company--Home Owner Protection Economics, Inc. ("HOPE").  According to its bylaws, HOPE was a "nonprofit organization," established "exclusively for charitable, scientific[,] and education purposes."  HOPE purported to sell mortgage modifications for an up-front fee of $400 to $900.  After

---

[1] Our resolution of the issues does not hinge on the lens through which we view the evidence, so we summarize that evidence in a simple and straightforward manner, albeit one that recognizes that the jury voted to convict.

[2] This number connected applicants with counselors approved by the Treasury Department.

receiving the fee, HOPE provided the homeowner with an application form that differed in just one respect from the Treasury Department's free HAMP form: HOPE's phone number (877-HOPE-801) replaced the government's official phone number (888-995-HOPE).

Located in Delray Beach, Florida, HOPE operated out of a "boiler room." The room contained rows of cubicles filled with telemarketers.[3] Godfrey, the president,[4] and Fischer, the vice president,[5] sat atop a raised platform overlooking the room. Vernell Burris, the general manager,[6] sat "shoulder-to-shoulder" with Godfrey and Fischer on the platform.

Godfrey and Fischer paid employees on commission only, and fired employees "daily" for making too few sales. Fischer recruited labor from nearby drug rehabilitation facilities because, in his view, those people "were manipulative . . . [and] smooth about lying." Few new employees lasted more than a week.

Godfrey and Fischer encouraged their employees to lie. For example, when Burris first started working at HOPE, he had

---

[3] At its peak, HOPE employed 42 telemarketers.

[4] Godfrey provided the initial investment for HOPE. He also bought "lead" lists of information about homeowners who were behind on mortgages.

[5] Fischer was in charge of recruiting and training telemarketers. He gave guidance to new employees about how to make sales.

[6] Burris assisted with recruiting and training telemarketers, as well as handling complaints from upset customers.

trouble making sales. Fischer encouraged him to tell customers, among other lies, that HOPE had a "98 percent success rate" in achieving loan modifications. As already mentioned, the record suggested that only around ten percent of applications at major banks achieved modification through HAMP. Brian Kelly, one of HOPE's top-selling telemarketers, estimated that only four or five of his 150-plus customers acquired a modification. Godfrey instructed employees to say at the beginning of the process that their request for loan modification was approved, and required only the completion of additional paperwork and, of course, the receipt of a check. In fact, the loan modification request could never have been granted at the outset of the process, much less by HOPE rather than the lender.

After not receiving the benefits promised to them, customers complained both to HOPE and to state authorities. Many sent e-mails directly to Godfrey and Fischer trying to get refunds. In general, the complaints informed defendants that customers felt misled and had sought refunds with no success. Burris generally fielded customer complaints, but he discussed them with Godfrey and Fischer. Six states sent cease-and-desist letters directly to HOPE.[7] Those letters--addressed to HOPE--informed HOPE that it lacked a license required to engage in loan modification services.

---

[7] Cease-and-desist letters came from Washington, New Hampshire, Connecticut, Maine, Oregon, and Illinois.

A letter from Maine's Bureau of Financial Institutions informed HOPE that its solicitations were deceptive.

In response to the cease-and-desist letters, Godfrey constructed a list of "do not call states," including HOPE's home state of Florida.[8]  In January 2011, Fischer distributed a restrictive covenant for employees to read and sign.  That covenant forbade employees from making misrepresentations and from disclosing HOPE's business methods.  According to Burris, the covenant was intended to "cover our butt[s]" in case the government ever investigated HOPE.

Godfrey and Fischer enjoyed lavish trips with their ill-gotten gains.  When funds ran low, Godfrey instructed Burris to "[l]et the dogs out," i.e., do whatever necessary to increase sales.  All told, HOPE raked in over $3.2 million, before the scheme came to an end when authorities searched HOPE's office in April 2011.

In August 2011, a grand jury indicted Godfrey, Fischer, Burris, and Kelly for mail fraud, 18 U.S.C. § 1341, wire fraud, id. § 1343, misuse of a government seal,[9] id. § 1017, and conspiracy to

---

[8] Defendants told Burris: "It's our backyard.  Stay out of Florida.  We don't want to get shut down, and we damn sure don't want the Attorney General from Florida . . . coming after us."

[9] Only Godfrey and Fischer were charged with misusing a government seal.

commit these crimes, <u>id.</u> § 371.[10]  Burris and Kelly pleaded guilty

and testified against Godfrey and Fischer.  Nine of HOPE's victims

also testified.  After an eight-day trial, the jury convicted

Godfrey and Fischer on all counts.[11]  The district court sentenced

them each to 84 months in prison.

## II.  Analysis

## A.  Confrontation Clause Challenge

At trial, the principal defense was that Godfrey and

Fischer did not know of their "rogue" employees' fraudulent sales

tactics.[12] Countering this defense, the government introduced

thirty-two emails from complaining customers addressed to either

Godfrey or Fischer, and six cease-and-desist letters addressed to

---

[10] The indictment outlined HOPE's various material falsehoods, including: (1) HOPE was affiliated with the homeowner's mortgage lender; (2) the homeowner had been approved for a home loan modification; (3) the homeowner would receive a specified reduction in his or her monthly mortgage payment amount or interest rate; (4) HOPE had a near perfect record of obtaining modification; (5) HOPE was able to greatly increase the homeowner's chance of obtaining a modification, in part because of its connections with mortgage lenders; (6) homeowners could stop making mortgage payments while they waited for HOPE to arrange their loan modification; (7) HOPE operated as a non-profit entity; and (8) HOPE would refund the customer's up-front fee if the modification were not successful.

[11] Counts 6 and 15 were dismissed because the customer to whom those counts related was unavailable to testify.

[12] In the words of Godfrey's trial counsel: "Well, I'm not going to tell you that the testifying customers were not defrauded. . . . They were lied to, for sure, but who lied to them?  Brian Kelly lied to them. . . .  But there is no link between Chris Godfrey and Dennis Fischer and those lies"; "this trial is a misguided attempt . . . to hold the owners of a company criminally responsible for the misdeeds of their employees."

HOPE. The district court admitted these communications for the limited purpose of showing that Godfrey and Fischer had notice of customers complaining about fraudulent activities. The district court admitted the communications without redaction and gave multiple limiting instructions.[13]

---

[13] Specifically, the district court instructed the jury regarding the cease-and-desist letters as follows:

> Now, the letters from the state entities include certain allegations about what HOPE was doing that the entities say were not terrific. These documents are being offered for the sole purpose of showing that there was notice to Mr. Godfrey and/or Mr. Fischer, that there were people who were complaining and there were these entities that were complaining.
>
> They cannot be used by you for the truth of what's contained in the letter. So . . . as a result of seeing these letters, you cannot determine that, in fact, . . . [the defendants] did wrong.

The court similarly instructed the jury regarding the customer complaints:

> They're not in for whatever these people thought of HOPE or whatever else is going on. They're simply in evidence for the purpose of showing that there were complaints and that Mr. Godfrey and/or Mr. Fischer were recipients of some or all of these complaints. That's it.

And, as part of the final jury charge, the district court instructed as follows:

> Note that there were certain exhibits . . . that were offered and admitted for a limited purpose. So, for example, there were a bunch of emails that contain some kind of complaint by somebody and those were offered into evidence and admitted for one purpose only, which is to show that the defendants had notice that people were unhappy. They cannot be used by you for the truth of what's contained in them. That is, what is actually

Defendants argue that statements in the complaints and cease-and-desist letters describing fraudulent activity by HOPE employees were testimonial hearsay, and thus were submitted to the jury--over objection--in violation of the Sixth Amendment's Confrontation Clause. The simple answer to this argument is that these exhibits were not offered to prove the truth of the assertions of wrongdoing contained within the exhibits. Rather, they were offered to disprove the defendants' principal defense: that they did not know what their employees were doing. Neither the rules of evidence, see Fed. R. Evid. 801(c)(2), nor the Confrontation Clause, Williams v. Illinois, 132 S. Ct. 2221, 2235, 2256, 2268 (2012), prohibits such a use. See generally United States v. Cruz-Díaz, 550 F.3d 169, 176 (1st Cir. 2008) ("Out-of-court statements offered . . . for the limited purpose of showing what effect the statement had on the listener . . . are not hearsay.").

But, say defendants, there was no need for the jury to see the substance of the complaints. Of course there was. Because the complaints described alleged fraudulent sales tactics, one can infer that Godfrey and Fischer had notice that their employees were likely engaged in such tactics. Had the complaints and letters claimed only that HOPE employees were unlawfully parking in a

---

said[,] . . . you cannot take that as the truth.

neighbor's parking lot, the nexus to the proffered defense would have been severed.

Second, even were this a Confrontation Clause violation, we would find it harmless beyond a reasonable doubt. See United States v. Cameron, 699 F.3d 621, 652 (1st Cir. 2012) (when deciding whether violation was harmless, we consider whether "statements were merely cumulative," "the strength of corroborating or contradicting evidence," and the case's "overall strength" (internal quotation marks omitted)). There was no dispute at trial that the company's employees made the fraudulent sales that we have described and about which the customers and regulators complained. So, even if the jury considered the complaints for the purpose of showing that those customers were defrauded, nothing material would have been added to the case. The government's case, too, was not merely strong; it was overwhelming. The notion that, perched like commanders in the bow of a Roman galley, Godfrey and Fischer had no idea that their hired crew was systematically rowing the ship in circles strikes us--as it undoubtedly struck a jury that took little over three hours to find Godfrey and Fischer guilty--as preposterous.

**B.    Constructive Amendment Claim**

Under the rubrics of "constructive amendment," and "prejudicial variance," defendants merge two arguments. First, they point out that one of the facts alleged in the indictment to

show that HOPE did not operate as a nonprofit was a premature assertion that the IRS had denied HOPE's "application for federal non-profit status." In fact, the IRS did not deny HOPE's application for tax exempt status as a non-profit corporation until two weeks after the indictment was issued (but before trial).[14] Second, defendants complain that the government put into evidence HOPE's application to the IRS, and it pointed out to the jury that the application contained false statements, such as a gross understatement of the defendants' salaries.

Collectively, argue defendants, the error in the indictment and the submission of the false application created a constructive amendment in the form of a "pivot" from a charge that defendants misled consumers about how HOPE operated into a charge that defendants misled the IRS. We review claims of constructive amendment and prejudicial variance de novo. United States v. Celestin, 612 F.3d 14, 24 (1st Cir. 2010) (constructive amendment); United States v. Gomez, 716 F.3d 1, 7 (1st Cir. 2013) (prejudicial variance).

A material falsehood must be proven to convict a defendant of mail or wire fraud. See Neder v. United States, 527 U.S. 1, 25 (1999). The manner and means section of the indictment's conspiracy count outlined many of HOPE's material

---

[14] The government did not object to amending the indictment to remove that factually incorrect statement, but defendants objected, so the court left matters alone.

-11-

falsehoods.  See note 7, supra.  Those charged falsehoods included the following: "HOPE operated as a non-profit entity."  The indictment elaborated on that material falsehood as follows:

> In an effort to portray HOPE as a legitimate entity whose goal was to help struggling homeowners, HOPE telemarketers repeatedly told potential customers that HOPE was a "non-profit."
> In fact, HOPE had obtained its Florida non-profit status by fraudulently misrepresenting its corporate purpose, as "Provide Consumers Education for purpose of managing personal debt."
> Furthermore, HOPE did not operate as a legitimate non-profit entity.  The IRS recognized this and rejected HOPE's application for federal non-profit status.  The IRS provided HOPE with a detailed analysis to support its conclusion that HOPE operated as a commercial entity. GODFREY and FISCHER used a substantial amount of money from HOPE's business accounts for personal expenses, including restaurant dining, fitness club memberships, department store purchases, international travel, liquor store purchases, and swimming pool maintenance.

(emphasis added).

The substance of that charged material falsehood--that HOPE telemarketers falsely represented HOPE as a legitimate non-profit entity--remained unaltered through trial and verdict.  The jury instructions limited the jury precisely to these charges, identifying phone calls and mailings to consumers as the wire and mail communications, and identifying the consumers as the target of fraudulent representations.  In short, the jury convicted Godfrey and Fischer for precisely the mail and wire fraud for which they

were charged.  All that changed was that the government dropped one piece of evidence (a pre-indictment IRS denial) cited to prove that HOPE was not a legitimate nonprofit.

A constructive amendment "occurs where the crime charged has been altered, either literally or in effect, after the grand jury last passed upon them."  United States v. Mubayyid, 658 F.3d 35, 49 (1st Cir. 2011) (internal quotation marks omitted).  The elimination of a piece of evidence supporting the material falsehood, by contrast, was a mere variance.  See id. at 48 (variance occurs when evidence offered at trial "proves facts materially different from those alleged in the indictment").  "In short, when a change le[aves] the substance of the charge unaffected, the switch d[oes] not usurp the prerogative of the grand jury."  United States v. Dowdell, 595 F.3d 50, 67–68 (1st Cir. 2010) (alterations in original) (internal quotation marks omitted).  A variance is grounds for reversal "if it affected the defendant's 'substantial rights'--i.e., the rights to have sufficient knowledge of the charge against him in order to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense."  United States v. Fisher, 3 F.3d 456, 463 (1st Cir. 1993) (internal quotation marks omitted).[15]

---

[15]  A variance is also grounds for reversal if there is "prejudicial spillover."  Fisher, 3 F.3d at 463.

Here, the government listed eight different misrepresentations to support the mail and wire fraud charges.  The incorrect fact that the government dropped from its proof (a pre-indictment IRS denial) served as just one fact supporting only one of those eight misrepresentations, any one of which could have supported conviction on the charged crime.  The defendants would have us lose sight of the forest by focusing on just one tree.  See Mubayyid, 658 F.3d at 53–54 (where government supplies more specificity than required, a change in that surplusage does not affect the charge's substance); see also United States v. Miller, 471 U.S. 130, 136 (1985).  Nor did this drop in evidence put them at any risk of double jeopardy, as the government never argued that the jury should convict defendants for lying to the IRS (i.e., an offense for which they were not charged).

Nor, finally, was there any reason that the government should have been precluded from putting the application itself into evidence as relevant to the charged offense.  The fact that defendants felt it necessary to lie in describing their pay from HOPE was directly relevant to proving their knowledge of the material falsehood.

C.  **Instructions on Misuse of Government Seal**

The jury convicted defendants of misuse of a government seal under 18 U.S.C. § 1017.  In relevant part, the statute criminalizes the use of a document to which a government seal has

been fraudulently affixed where the user acts with knowledge of the document's fraudulent character, and with wrongful or fraudulent intent.[16]  In addressing the charged violation of this statute, the district court instructed the jury that the government had to prove three elements beyond a reasonable doubt to convict under 18 U.S.C. § 1017:

> One, that the defendant procured or transferred a document to which was affixed the seal of the Department of the Treasury. Two, that the defendant knew that the seal had been fraudulently affixed to the document; and, three, that the defendant acted with a fraudulent intent when he did that.

Defendants argue that this instruction was erroneous because it failed to tell the jurors that they also needed to find that the seal was fraudulently affixed to or impressed on the document.  We disagree.  The charge as given efficiently made clear that, in order to convict, the jurors needed to find that defendants "knew that the seal had been fraudulently affixed to the

---

[16]  The statute states:

> Whoever fraudulently or wrongfully affixes or impresses the seal of any department or agency of the United States, to or upon any certificate, instrument, commission, document, or paper <u>or with knowledge of its fraudulent character, with wrongful or fraudulent intent, uses , buys, procures, sells, or transfers to another any such certificate, instrument, commission, document, or paper, to which or upon which said seal has been so fraudulently affixed or impressed</u>, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1017 (emphasis added).

document." See 18 U.S.C. § 1017. The jurors could not logically make such a finding unless they also concluded that the seal was indeed fraudulently affixed. Such a conclusion was inevitable. Each time one of the ersatz forms was printed onto a piece of paper, the seal was affixed to the paper for a fraudulent purpose. Defendants' use of the documents therefore plainly constituted that which the statute on its face criminalizes: "us[ing]" a "document . . . to which or upon which [the] seal has been . . . fraudulently affixed or impressed . . . ." Id.; see also United States v. Goodyke, 639 F.3d 869, 872 (8th Cir. 2011).

## D. Biased Juror Claim

Defendants argue that the district court's denial of their request to remove Juror No. 7 deprived them of their constitutional guarantee to an impartial jury. On the fifth day of trial, the government presented evidence that several of HOPE's victims had received yellow postcards from HOPE. Juror No. 7 subsequently approached the court clerk and revealed that she had received a similar-looking mailer two or three years ago. When asked at voir dire whether this prior experience caused her "any feelings or biases or views about this case," Juror No. 7 replied, "I don't know. What do you think?" After her response elicited laughter in the courtroom, the district court followed up:

> **Court**: No. The question is--I think the question he's asking is do you--will it affect your ability to decide this case fairly based on what you hear in the courthouse?

-16-

**Juror No. 7**: I don't think so. I mean, I didn't do anything with it. It didn't cause me any grief. I feel that I was probably a target.

**Court**: Do you have any--did your remembering this in any way change your view of this case, such a view as you may have at this point?

**Juror No. 7**: I don't think so.

Defendants claim that Juror No. 7 bore bias as a matter of law and in fact. They note that, prior to trial, the court had excused other prospective jurors who had more attenuated connections with the facts of the case. Defendants also make much of the government's theory that defendants "specifically targeted people who were at [a] very vulnerable time[] in their lives."

We review the district court's ruling on a claim of juror bias for clear abuse of discretion. United States v. Lowe, 145 F.3d 45, 48 (1st Cir. 1998). In assessing juror bias claims, "the deference due to district courts is at its pinnacle: 'A trial court's findings of juror impartiality may be overturned only for manifest error.'" Skilling v. United States, 561 U.S. 358, 396 (2010) (quoting Mu'Min v. Virginia, 500 U.S. 415, 428 (1991)). That being said, the presence of even a single biased juror requires reversal. See Parker v. Gladden, 385 U.S. 363, 366 (1966) (defendant "was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors").

Juror No. 7 did not bear what we call "bias as a matter of law." Bias as a matter of law is reserved for only "exceptional" or "extreme" circumstances. See, e.g., United States v. Burgos-Montes, No. 13-2305, 2015 WL 2223304, at *12 (1st Cir. 2015); see also Smith v. Phillips, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring) (suggesting as exceptional situations when the juror is an "employee of the prosecuting agency," or was a "witness"). Mere receipt by a juror prior to trial of a similar mailer, likely from another company, is simply not an extreme situation warranting a finding of implied bias. Cf. Lowe, 145 F.3d at 48-49 (no implied bias where juror in rape case was a survivor of attempted rape).

Nor did the district court abuse its discretion in finding that the juror bore no bias in fact. The juror's "[w]hat do you think?" response was apparently flip, as noted by defense counsel, and could certainly be read as expressing skepticism that the receipt of a similar form or card could render her unable to decide the case fairly. Juror No. 7 subsequently said that the yellow card did not cause her much grief. She was asked point blank a second time whether her prior experience affected her views of the case, and she said, "I don't think so." Compare Lowe, 145 F.3d at 49 (no abuse of discretion where juror said, "I don't think so" in response to judge's question whether her prior experience as survivor of attempted rape would affect her ability to serve on

jury in rape case).  The record does not cause us to think the district court's credibility finding here constituted a manifest abuse of discretion.  Wainwright v. Witt, 469 U.S. 412, 428 (1985) (juror credibility determinations are "peculiarly within a trial judge's province.").[17]

### III.  Conclusion

We affirm Godfrey's and Fischer's convictions.

---

[17] Although defendants do not make anything of it, more potentially problematic was the exchange at the end of voir dire when the district court asked yet again whether Juror No. 7 had any "doubt but that you can fairly try this case."  Juror No. 7's literal reply to that question was, "I believe so."  The lack of any reaction or comment by the trial judge or counsel suggests, however, that everyone present understood her response to mean that she could fairly try the case.  Given the standard of review, there is nothing in the record here to suggest the district court abused its discretion.

That being said, we are taken aback by the prosecution's effort to cause us to think the literal record reads other than it does.  The actual transcript reads precisely as follows:

**Court:** Do you have any doubt but that you can fairly try this case regardless of what the card may have said or what it said to you?

**Juror No. 7:**  I believe so.

Rather than arguing that the exchange, in context, need not be read literally, the prosecution in its brief edited its quote of the transcript to read as follows:  "Finally, the court asked whether 'you can fairly try this case . . . .'  The juror said she 'believe[d]' she could."

-19-