# United States Court of Appeals
## For the First Circuit

No. 15-1608

UNITED STATES OF AMERICA,

Appellee,

v.

ERNEST KAR,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Lynch, Lipez, and Thompson,
Circuit Judges.

Alan D. Campbell for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Peter F. Neronha, United States Attorney, was on brief, for
appellee.

March 13, 2017

**LIPEZ**, <u>Circuit Judge</u>.  At the conclusion of a four-day trial, a jury convicted defendant-appellant Ernest Kar on three counts of bank fraud and one count of conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344 and 2.  The district court subsequently sentenced Kar to ninety-three months of imprisonment and ordered him to pay $532,152 in restitution.  Kar appeals his conviction, arguing that the district court (1) deprived him of his Sixth Amendment right to effective counsel by refusing to grant his request for a new lawyer; (2) further deprived him of his Sixth Amendment right to counsel by allowing Kar to represent himself at trial when he had not unequivocally waived that right; and (3) abused its discretion when it declined to dismiss a juror for potential bias.

Because we find the district court committed no error, we affirm Kar's convictions.

## I.

### A. Kar's Requests for Substitute Counsel and Self-Representation

In April 2014, Kar was arrested and charged with committing bank fraud and conspiracy to commit bank fraud, related to a counterfeit check cashing scheme that he was running in Rhode Island, Massachusetts, and New Hampshire.  Attorney Melissa Larsen was appointed to represent him the following month.

Kar filed a pro se motion seeking substitute counsel on September 8, 2014, accusing Larsen of neglecting to keep him current

on his case and failing to oppose government motions for extensions of time.[1]  The court held a hearing a week later, in which Larsen stated that she had kept Kar apprised of his case and that she had been attempting to secure him a plea deal.  The court then asked the government to leave, sealed the courtroom, and apparently engaged in an untranscribed conversation with Kar and Larsen.  Upon reopening the record, the court denied Kar's motion.

The following month a federal grand jury issued an eight-count indictment, charging Kar with five counts of committing bank fraud, one count of conspiracy to commit bank fraud, and two counts of aggravated identity theft.[2]  At his October 2014 arraignment, Kar orally asked the district court to appoint substitute counsel. At a subsequent hearing on that request, Kar stated that although he and Larsen had "some things to iron up," it was their "hope [to] continue."  Accordingly, Larsen continued to represent Kar.

Kar's satisfaction was short-lived; he requested new counsel for a third time -- this time by way of a pro se written

---

[1] The government filed three motions to extend the time period to file an indictment or information against Kar -- as required by the Speedy Trial Act, 18 U.S.C. § 3161(b) -- while it engaged in plea negotiations with Larsen.

[2] Soon after the indictment was issued, the court dismissed -- at Larsen's request -- one of the bank fraud counts and both of the aggravated identity theft counts.  It also dismissed a second bank fraud count at the government's request just before Kar's trial commenced, leaving three counts of bank fraud and one count of conspiracy to commit bank fraud to be tried before the jury.

motion -- in November 2014.  At a hearing on December 9, Kar expressed a number of concerns: Larsen was not effectively communicating with him; she failed to defend him against a number of charges supposedly committed while he was in custody;[3] and she had failed to secure bail.  The district court expressed skepticism about his complaints, warned Kar that it believed he had "a fundamental misunderstanding of what the evidence [was] in the case and what the obligations of the government and [Kar's] lawyer were," and ultimately denied his motion.

Kar filed yet another pro se motion in January 2015, again seeking new counsel, or, in the alternative, permission to exercise his Sixth Amendment right of self-representation.  In this motion Kar complained that Larsen failed to (1) hire an investigator to counter the government's case, (2) subpoena Kar's phone records to support his defense, (3) prepare a bond package that Kar had requested, and (4) negotiate a plea deal that satisfied Kar's sense of reasonableness.  Kar also argued that his relationship with Larsen had become "irreconcilable" and that communication between the two of them was "irretrievably broken."

Larsen filed a response to Kar's motion, stating that she had met with Kar on eight occasions and corresponded with him in writing thirteen times.  Additionally, she asserted that she had

_____

[3] Larsen had, in fact, convinced the prosecutor to dismiss the charges to which Kar was referring.  See supra note 2.

- 4 -

provided Kar with complete copies of all discovery provided by the government, described her active role in the plea bargaining process, and recounted that she obtained dismissal of three of the counts in the indictment based upon information that Kar had provided to her.[4]

Kar subsequently sent a letter to the district court stating that he had wanted to negotiate a guilty plea, but Larsen had not given him any information about his possible sentence other than the statutory maximum. He also complained that Larsen had failed to obtain a pre-sentence report from the probation department outlining his calculated offense level, criminal history range, and potential Guidelines sentencing range.

The district court held a hearing on Kar's latest motion for new counsel on January 29. At the hearing, Kar recounted his qualms with Larsen. The court then explained to him that pre-sentence reports are drafted by the probation office only after a defendant has been convicted by a jury or entered a guilty plea.

After the court indicated that it would not grant his motion for new counsel, Kar stated that he wished to exercise his Sixth Amendment right to proceed pro se. At first, the court was disinclined to allow Kar to represent himself because it viewed him

---

[4] Additionally, two days after responding to Kar's motion for substitute counsel, Larsen filed two motions in limine and a pretrial memorandum on his behalf.

as "completely ignorant of the law." After a recess, however, the court chose to engage with Kar in the colloquy prescribed by Faretta v. California, 422 U.S. 806 (1975), which held that a criminal defendant has a Sixth Amendment right to self-representation so long as the defendant relinquishes the "traditional benefits associated with the right to counsel . . . knowingly and intelligently." Id. at 835 (internal quotation marks omitted). Following a thorough discussion with Kar in which the court warned him of the consequences of proceeding pro se, Kar maintained that he still desired to represent himself. The court consequently granted his request and appointed Larsen to be his standby counsel.

At jury selection, the magistrate judge also engaged in a colloquy with Kar regarding his decision to proceed pro se. She again warned Kar about the consequences of representing himself, and then asked if he understood the risks he was taking. Although Kar responded that he did, he complained that he was "forced" to represent himself because his motions for new counsel were denied. He also protested that he was not prepared for trial.

After explaining to Kar that she was "not in a position to grant [him] an extension," the magistrate again offered him the option of counsel:

> You need to choose: Do you wish to proceed pro se, or, do you wish to re-engage with Ms. Larsen as your attorney? She is a very competent and well-respected member of the bar of this court. But, that is your decision. Is it still your

> wish to remain pro se, understanding the
> seriousness of what you're facing?

Kar replied that he had "no choice but to go pro se" because there was a "complete communication breakdown for the past nine months" and reiterated: "[I]f I cannot be appointed new counsel, then I have no choice . . . this court is forcing me to go pro se, and I'm going to go pro se." Jury selection thus proceeded with Kar representing himself, though he conferred with Larsen at least seven times during the jury selection process.

On the first day of trial, the district court again warned Kar before the entry of any evidence that she believed he was making a "bad decision" by proceeding pro se, but Kar nonetheless chose not to heed the judge's warnings. Although Kar protested Larsen's presence as his standby counsel just before lunch on the second day of trial, the court told him that it was not willing to replace Larsen with another attorney. Kar did not complain about Larsen again, and he continued to confer with her throughout the remainder of the four-day trial.

## B. Juror Number One

On the first day of the trial, before the jury was brought into the courtroom, the government informed the court that it had learned that morning that its paralegal -- who had not been present for jury selection but was in court that day -- personally knew Juror Number One. Specifically, the prosecutor stated that the

paralegal was "friendly with Juror Number One's sister," that she "kn[ew] . . . Juror Number One for quite a few years," and that "she tells me she sees her maybe once a year, but they are on some social net media together."  In response to this information, the court brought Juror Number One into the courtroom and engaged in the following colloquy:

> COURT:    [I]t has come to our attention that despite all of the questioning that occurred here during jury selection, apparently the paralegal who works for the United States Attorney's Office and who is in court here today is someone who knows you. . . .
>
> JUROR:    Yes.
>
> COURT:    So can you tell me what the nature of your relationship is?
>
> JUROR:    Family friend.
>
> COURT:    Okay. How frequently do you see her or speak to her either in person or even through social media?
>
> JUROR:    Not through social media, not very often.  My sister babysits for her pretty frequently; I have maybe once or twice.
>
> COURT:    Okay. And have you ever discussed this case with her?
>
> JUROR:    No.
>
> COURT:    Have you ever discussed her work in the United States Attorney's Office?
>
> JUROR:    No.
>
> Court:    Is there anything about that relationship with [the paralegal] that would make it difficult for you to listen to the

> evidence in this case and listen to the
> instructions on the law and render a fair and
> impartial verdict?
>
> JUROR: No.
>
> COURT: You're sure of that?
>
> JUROR: Yes.

The judge then asked if the prosecutor had any further questions. He did not. She next asked Kar if he had any questions. Kar conferred with Larsen and -- without asking the juror any questions -- requested that the court strike the juror due to her personal connection to the paralegal. Without asking the government for its position on Kar's request, the court denied it and cautioned the juror "not to discuss the matter at all with [her] sister and obviously not at all with [the paralegal]." The juror agreed, and the trial began.

## II.

The four-day trial culminated with the jury returning a guilty verdict on all counts. The district court subsequently sentenced Kar to eighty-four months of imprisonment, and ordered him to pay $532,152 in restitution. Because Kar was on supervised release for a prior federal conviction when he committed the crimes, the court sentenced him to an additional nine months of incarceration to be served consecutively to his sentence of

conviction for a total of ninety-three months of imprisonment. This timely appeal followed.[5]

Kar advances three claims on appeal. First, he argues that the district court violated his Sixth Amendment right to effective assistance of counsel when it denied his repeated motions for new counsel, forcing him to choose between proceeding with ineffective counsel or proceeding pro se. Second, Kar insists that his waiver of counsel was not unequivocal, as required by law, because he vacillated when expressing his desire to proceed pro se under questioning by both the district court judge and the magistrate judge. Finally, Kar argues that the district court abused its discretion by not removing Juror Number One from the panel -- or at a minimum designating her an alternate when two alternates were available -- thus compromising the jury's impartiality. We address each of Kar's arguments in turn.

---

[5] Although Kar's pro se notice of appeal specifically restricted the issues to be argued on appeal to a number of sentencing factors, he now seeks to challenge the merits of his conviction with the benefit of counsel. "[B]ecause the merits of the appeal favor the appellee, we will bypass the jurisdictional issue" concerning the scope of Kar's notice of appeal. United States v. Woods, 210 F.3d 70, 74 (1st Cir. 2000) The defects in the notice of appeal do not bear upon Article III subject matter jurisdiction, and, hence, do not prevent us from addressing Kar's appeal. See id., at 74 n.2 (1st Cir. 2000) (noting that this circuit construes the Supreme Court's ban on "hypothetical jurisdiction" to apply only to Article III subject matter jurisdiction).

## A. Kar's Motions for New Appointed Counsel

Criminal defendants have a fundamental right of representation by effective counsel throughout the trial process. Johnson v. Zerbst, 304 U.S. 458, 467-68 (1938); see also United States v. Proctor, 166 F.3d 396, 401 (1st Cir. 1999). Still, the Sixth Amendment does not provide an unfettered right to appointed counsel of a defendant's choosing. United States v. Jones, 778 F.3d 375, 388 (1st Cir. 2015). "[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. 153, 159 (1988). District courts, in some circumstances, may force criminal defendants to choose between effective representation by unwanted counsel and proceeding pro se. See, e.g., Jones, 778 F.3d at 388; Proctor, 166 F.3d at 402.

We review a district court's decision denying a defendant's motion for new counsel for abuse of discretion. United States v. Francois, 715 F.3d 21, 29 (1st Cir. 2013). We analyze the district court's decision based upon three factors set forth in United States v. Allen, 789 F.2d 90, 92 (1st Cir. 1986): "(1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the defendant's complaint; and (3) whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense."

- 11 -

Francois, 715 F.3d at 28 (quoting United States v. Hicks, 531 F.3d 49, 54-55 (1st Cir. 2008)).

Kar first asked for new counsel in September 2014. Although he appeared to reconcile with Larsen for a short period thereafter, he consistently sought new counsel for more than two months leading up to his trial. We agree with his assertion that the request for substitute counsel was timely.

We do not, however, agree with Kar's contention that the court "refused to let [him] air all his complaints." The district court engaged with Kar and Larsen no fewer than four times in an attempt to determine whether appointing new counsel was appropriate. At two separate hearings scheduled specifically for the purpose of addressing Kar's motions for new counsel, the court exhaustively probed both Kar and Larsen to ascertain the quality of communication between them. The court eventually limited Kar's efforts to speak, but it did so only after ensuring it had an adequate understanding of his position. As in Allen, the court "invited [Kar] to make a statement, listened to his reasons for being dissatisfied with his counsel, and found them to be without merit." 789 F.2d at 93.

Nor did Kar experience "a total lack of communication [with counsel] preventing an adequate defense." Id. at 92. Kar withdrew his initial grievances concerning Larsen at his October 2014 hearing when he told the court that it was his "hope [to]

continue the way it is" with Larsen as his attorney. Only from November onward did he steadfastly insist upon new representation. But Larsen maintained that the two continued to communicate, stating that she had met with Kar personally on eight occasions -- twice after their alleged communication break in November -- and corresponded with him in writing a total of thirteen times. She further asserted that she had provided Kar with a comprehensive copy of discovery and obtained dismissal of three counts based on information he provided to her.[6]

Kar's actual grievance was not that he and Larsen were failing to communicate, but instead that he simply disliked the substance of Larsen's advice. Disfavoring counsel's guidance is distinct from failing to communicate with counsel, and the third Allen prong does not guarantee "the right to a 'meaningful relationship' between an accused and his counsel." United States v. Machor, 879 F.2d 945, 952 (1st Cir. 1989) (quoting Morris v. Slappy, 461 U.S. 1, 14 (1983)). Hence, we agree with the district court's determination that there was no breakdown in communication between Kar and Larsen, and we conclude that the district court did

---

[6] Kar's conduct subsequent to the court's denial of substitute counsel bolsters its conclusion that Kar and Larsen had not experienced a total breakdown of communication. Even after Kar proceeded pro se, he continued to confer with Larsen numerous times during jury selection and throughout his trial.

not abuse its discretion when it denied Kar's motion for substitution of counsel.

## B. Kar's Waiver of His Right to Appointed Counsel

Kar's second argument is related to his first. He contends that the district court denied his Sixth Amendment right to an attorney by allowing him to represent himself at trial. We review a trial court's decision to allow a defendant to proceed pro se for abuse of discretion. United States v. Woodard, 291 F.3d 95, 109 (1st Cir. 2002).

Although the Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel, defendants maintain an alternative right to self-representation. United States v. Robinson, 753 F.3d 31, 42 (1st Cir. 2014) (citing Faretta, 422 U.S. at 817). Nonetheless, "'[b]ecause of the disadvantages to a defendant that inure from pro se representation, a defendant must "knowingly and intelligently" waive his right to counsel before he may be permitted to proceed pro se.'" Francois, 715 F.3d at 29-30 (quoting United States v. Kneeland, 148 F.3d 6, 11 (1st Cir. 1998)).

Hence, before a judge can allow a criminal defendant to proceed pro se, she is required to engage in what is sometimes called a "Faretta colloquy." A judge must examine the defendant, "'indulge in every reasonable presumption against waiver of the right to counsel,' and 'investigate as long and as thoroughly as the circumstances of the case before [her] demand.'" Robinson, 753

F.3d at 43 (quoting Proctor, 166 F.3d at 401-02). Typically, when a defendant challenges a trial court's decision permitting him to represent himself, the defendant attacks the comprehensiveness of the district court's Faretta inquiry. See, e.g., Jones, 778 F.3d at 389-90; Robinson, 753 F.3d at 42; Francois, 715 F.3d at 30. Here, Kar does not dispute the adequacy of the district court's questioning, nor do we find any flaws with the court's exhaustive examination of Kar.

Instead, Kar raises a slightly more nuanced challenge, claiming that he did not surrender his right to counsel by using "unequivocal language." Woodard, 291 F.3d at 109 ("A defendant who seeks to relinquish her right to counsel must so state in unequivocal language."); see also Jones, 778 F.3d at 389; Robinson, 753 F.3d at 42. After the district court engaged in a comprehensive Faretta colloquy in which it warned Kar of the serious consequences of waiving his right to counsel, the court asked Kar, "[W]ith those warnings in mind, do you still wish to represent yourself at trial?" Kar replied, "Yes, your Honor." The court then appointed Larsen as standby counsel and explained to Kar her role. But it also warned him that even with standby counsel, it ultimately would be Kar, himself, who would be responsible for his defense, stating, "I want to make sure you're going into [the trial process] with your eyes wide open. Do you understand that?" Kar replied, "Absolutely."

Kar's choice to represent himself could not have been stated more unequivocally.

Yet Kar points to a stray comment he made shortly after his Faretta colloquy: "I just need an attorney who will just prepare my defense at trial." This comment, however, was not made in the context of the Faretta inquiry. Instead, it was simply an attempt to relitigate his dissatisfaction with the court's denial of his motion for substitute counsel, and, as he puts it, the "Hobson's Choice" that he faced between proceeding with an attorney whom he no longer wanted and representing himself. We have rejected this exact argument in the past. See, e.g., Francois, 715 F.3d at 28-29 (rejecting defendant's "Hobson's Choice" argument); Proctor, 166 F.3d at 402 ("We repeatedly have held that, in appropriate circumstances, a trial court may force a defendant to choose between proceeding to trial with an unwanted attorney and representing himself.").[7]

There is no question that Kar's decision to waive his right to counsel was knowing, intelligent, voluntary, and unequivocal. He even cited Faretta in his motion to persuade the district court judge to allow him to proceed pro se. See Robinson, 753 F.3d at 44-45 (noting that defendant's knowledge and citation

---

[7] Kar's similar complaints lodged with the magistrate judge at jury selection six days after unequivocally surrendering his right to counsel are equally unpersuasive.

of Faretta is additional evidence of the voluntary and intelligent nature of waiving the Sixth Amendment right to counsel and the risks involved therein).  Hence, the district court did not abuse its discretion by allowing Kar to waive his Sixth Amendment right to counsel and represent himself at trial.

**C. Juror Number One**

Kar argues that the district court undermined his Sixth Amendment right to a trial by an impartial jury by not granting his request to dismiss Juror Number One -- or at least demoting her to the role of alternate -- when the court discovered that she was a personal friend of the government's paralegal.

The presence of merely one biased member on a criminal jury requires reversal.  Parker v. Gladden, 385 U.S. 363, 366 (1966) (per curiam); United States v. Godfrey, 787 F.3d 72, 81 (1st Cir. 2015).  The Supreme Court instructs us that "[a] trial court's findings of juror impartiality may be overturned only for manifest error."  United States v. Casellas-Toro, 807 F.3d 380, 385 (1st Cir. 2015) (quoting Mu'Min v. Virginia, 500 U.S. 415, 428 (1991)). Under this stringent standard of review, we have consistently stated that we will reverse district court determinations regarding juror bias only where there has been a "clear abuse of discretion." Godfrey, 787 F.3d at 81; see also, e.g., United States v. Lowe, 145 F.3d 45, 48 (1st Cir. 1998).  Hence, when we review assessments of juror partiality, "the deference due to district courts is at its

pinnacle." Skilling v. United States, 561 U.S. 358, 396 (2010); see also Godfrey, 787 F.3d at 81.

Jurors may be biased in two ways. A juror's answers to questions on voir dire might display personal bias, which is referred to as "bias in fact." Godfrey, 787 F.3d at 81. Alternatively, a juror's life circumstances or relationship to one of the parties -- regardless of how the juror answers questions related to his or her impartiality on voir dire -- can reveal a "bias as a matter of law."[8] Godfrey, 787 F.3d at 81.

Juror Number One expressed no bias in fact. She asserted that she had never spoken to the paralegal about Kar's case specifically, or the paralegal's work generally. Moreover, she affirmed that she was "sure" her prior relationship with the paralegal would not prevent her from considering the evidence, listening to the judge's instructions, and rendering a fair and impartial verdict. There is nothing in the record to indicate that the juror's statements were dishonest.

Nor can we say that the juror posed any bias as a matter of law, which only occurs in "'exceptional' or 'extreme' circumstances." United States v. Burgos-Montes, 786 F.3d 92, 111 (1st Cir. 2015) (quoting Smith v. Phillips, 455 U.S. 209, 222 (1982)

---

[8] We sometimes refer to bias as a matter of law as "implied bias." See Godfrey, 787 F.3d at 81 (characterizing "bias as a matter of law" as "implied bias").

(O'Connor, J., concurring)).  In her concurrence in <u>Smith</u>, Justice O'Connor provided a non-exhaustive list of circumstances that might trigger a finding of bias as a matter of law.  455 U.S. at 222. They include "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction."  <u>Id.</u>

Kar argues that although Juror Number One was not an employee of the prosecuting agency, she "may have been an employee of a member of the prosecution team."  This characterization exaggerates the juror's relationship with the paralegal. Babysitting for the paralegal "maybe once or twice" is a far cry from the employer-employee relationship with the prosecuting agency condemned by Justice O'Connor.  Nor does the relationship mirror any of the other problematic conflicts highlighted in <u>Smith</u>.  Juror Number One's relationship with the paralegal did not constitute bias as a matter of law, and the district court did not commit a clear abuse of discretion by allowing her to serve.[9]

**Affirmed.**

---

[9] The government indicated at oral argument that in the future it plans to include the names of its paralegals on its list of attorneys and witnesses at jury empanelment.  We think this is a wise decision.  If the government had followed that practice here, this issue could have been avoided.