# United States Court of Appeals
## For the First Circuit

No. 18-1085

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN ELIAS GONZALEZ-ARIAS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

Robert C. Andrews for appellant.
Cynthia A. Young, Assistant United States Attorney, with whom
Andrew E. Lelling, United States Attorney, was on brief, for
appellee.

December 20, 2019

**THOMPSON**, **Circuit Judge**.    Until the Drug Enforcement Administration (the DEA) blew the lid off it, Juan Elias Gonzalez-Arias ran a thriving drug business out of his apartment — 264 East Haverhill Street, Unit 18, Lawrence, Massachusetts.  From those modest digs, he ordered kilograms of heroin from foreign sources, processed it, and dealt it to buyers around Massachusetts.  But in July 2015, federal agents swarmed the apartment, search warrant in hand, and arrested him.  Inside, they found a stolen gun, $30,088 in cash, and over a kilo of heroin, along with other narcotics and tools of the trade (including drug ledgers, scales, and a hydraulic kilo press).  Gonzalez-Arias was indicted and pled guilty to drug trafficking charges, including conspiracy to distribute one kilogram or more of heroin, which carried a ten-year mandatory minimum.[1]  The district judge sentenced him to 136 months in prison.

On appeal, Gonzalez-Arias offers several arguments — that the judge should have suppressed the evidence from his apartment, let him withdraw his guilty plea, appointed him a new lawyer for sentencing, and set a lower guideline sentencing range. We'll tackle each claim in turn — and all told, spotting no reversible error, we affirm.

---

[1] See 21 U.S.C. §§ 841(b)(1)(A), 846.  Gonzalez-Arias was also charged with two counts of distributing heroin (for each of two undercover buys), and one count of possessing heroin with intent to distribute it.  21 U.S.C. § 841(a)(1).

## MOTION TO SUPPRESS

### Background

In June 2016, when he (finally) settled on a lawyer (private attorney Scott Gleason),[2] Gonzalez-Arias's first order of business was to move to suppress the cache of evidence seized from his apartment. In greenlighting the search, the U.S. magistrate judge relied on an affidavit signed by DEA Special Agent Garth Hamelin. In it, Hamelin recounted a year-long investigation (involving wiretaps, video surveillance, and undercover drug buys) and he explained why his team had reason to believe they'd find evidence of a crime in Gonzalez-Arias's flat. In pressing a suppression motion, Gonzalez-Arias claimed that the facts in the affidavit didn't show probable cause for the search, so (as he told it), the magistrate judge shouldn't have issued the warrant, which triggered an unconstitutional search of his apartment. The judge disagreed and denied the motion to suppress. Gonzalez-Arias appeals that ruling to us, making the same Fourth Amendment claim.

---

[2] By that time, Gonzalez-Arias had already gone through several lawyers. First, then-public defender William Fick represented Gonzalez-Arias at his first appearance. Next, Gonzalez-Arias retained Steven DiLibero, who replaced Fick. Then, in November 2015, John Verdecchia and Brian Quirk replaced DiLibero. In April 2016, both Verdecchia and Quirk withdrew to make way for Gleason, who stayed on the case until March 2017.

**Law**

Under the Fourth Amendment, a search warrant may not issue without probable cause: a "nontechnical conception" that relies on "common-sense conclusions about human behavior" and "the factual and practical considerations of everyday life on which reasonable and prudent" people act. Illinois v. Gates, 462 U.S. 213, 231 (1983) (citations omitted). Given all the facts alleged in the DEA's warrant application, there must have been a "fair probability" — in other words, a "reasonable likelihood" — that the agency would find "evidence of a crime" in Gonzalez-Arias's apartment. United States v. Clark, 685 F.3d 72, 76 (1st Cir. 2012) (quoting Gates, 462 U.S. at 238); see also United States v. Roman, 942 F.3d 43, 51 (1st Cir. 2019) ("The inquiry is not whether 'the owner of the property is suspected of crime' but rather whether 'there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought.'" (quoting Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978))).

In reviewing a district court's decision to deny a motion to suppress, we review its legal conclusions afresh ("de novo"), and its fact findings for clear error. United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005). That said, we (like the district court) must give "considerable deference to reasonable inferences the issuing magistrate may have drawn" from the facts set out in

the affidavit supporting the DEA's application for the search warrant, reversing only if the affidavit contained no "substantial basis for concluding that probable cause existed." United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996) (cleaned up); accord Gates, 462 U.S. at 238-39.  And we're not stuck with the district court's reasons for denying the motion to suppress; we'll affirm if "any reasonable view of the evidence supports the decision."  Clark, 685 F.3d at 75.

### Application

Gonzalez-Arias doesn't dispute there was probable cause to believe he was part of a drug distribution conspiracy.  Nor could he.  DEA agents watched (through pole-mounted cameras and a GPS tracker on Gonzalez-Arias's car) and listened (via wiretaps) for over a year as he sold heroin to undercover agents and criminal associates and talked shop over the phone.  Agents heard him quarterback drug deals and hand-offs, negotiate prices with buyers and debts to suppliers, and solicit multi-kilo hauls of drugs from foreign sources.  And based on that surveillance, Agent Hamelin's affidavit colored Gonzalez-Arias a seasoned, high-volume drug trafficker.  For example, in the fall of 2014, he twice sold $2,100 worth of heroin (30 grams per sale) to the undercover agent — and that was just a preview.  During the second sale, he urged the agent to buy even more — "at least 100 [grams] *per week*" (emphasis added) — and suggested he'd sell up to "two kilos" of heroin for

$70 per gram.  And in March 2015, a cohort ordered just that amount (two kilos) from Gonzalez-Arias and came to his apartment to pick it up.  Just two months later — in his biggest move — Gonzalez-Arias told his associate to order at least ten kilos from a Mexican supplier, picked up the first one-kilo shipment himself, borrowed $20,000 to pay for the drugs,[3] then told the associate not to worry about where they would be stored because he (Gonzalez-Arias) would "welcome the women" (code for "kilograms of drugs," wrote Agent Hamelin).

And so, admitting there was "evidence that [he] was engaged in the drug trade" (and getting an A for understatement), Gonzalez-Arias takes aim at what we've called the "nexus" element of the probable cause standard, see United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (splitting the analysis into two parts: "probable cause to believe that (1) a crime has been committed — the 'commission' element, and (2) [that] enumerated evidence of the offense will be found at the place to be searched — the so-called 'nexus' element"), urging that "there was no direct evidence" that he used the apartment at 264 East Haverhill Street to peddle drugs "in the time period leading up to the search."

---

[3] By the way, that wasn't the first five-figure loan Gonzalez-Arias took to finance his drug business.  Agents later overheard him discussing another $20,000 debt to an overseas supplier.

This sally stumbles out the gate. A magistrate "interpreting a search warrant affidavit in the proper 'commonsense and realistic fashion'" may find "probable cause to believe that criminal objects" are in "a suspect's residence" even if there's no "direct evidence": that is, even if agents or their informants never spotted the illicit objects at the scene. Id. at 88 (quoting United States v. Ventresca, 380 U.S. 102, 108 (1965)). Rather, she may glean the link from circumstantial evidence, including the "type of crime" suspected and "normal inferences" about "where a criminal would hide [the] evidence" sought, combined with more "specific observations" (like bustle in and out before and after drug deals) identifying the residence as a probable hub or haven for criminal transactions. Roman, 942 F.3d at 51–52 (quoting Feliz, 182 F.3d at 88 and Ribeiro, 397 F.3d at 50–51). And such evidence abounded here.

For starters, common sense and experience teach that a big-time drug-mover like Gonzalez-Arias needs *somewhere* to keep his drug money, books, and spoils. See Feliz, 182 F.3d at 87–88 (finding it "reasonable" to think — based on "common sense, buttressed by [an] affiant's opinion as a law enforcement officer" — that a "long-time," multi-kilo-level "drug trafficker" would need to keep detailed accounts, customer lists, and money in a "safe yet accessible place" like his home). And here, Agent Hamelin (who had thirteen years of DEA experience) wrote in his

affidavit that traffickers like Gonzalez-Arias need to keep records (*e.g.*, balance sheets listing the considerable money he owed foreign drug sources), proceeds from sales (like cash and jewelry), paraphernalia (think scales, sifters, packaging, and heat-sealing devices), and weapons in "secure locations . . . for ready access" and to hide them from police. Though such "generalized observations" are rarely enough to justify searching someone's home, Roman, 942 F.3d at 52 (quoting Ribeiro, 397 F.3d at 50), they're still factors a judge can weigh in the balance, United States v. Rivera, 825 F.3d 59, 64–65 (1st Cir. 2016).

Against that backdrop, Gonzalez-Arias's calls and movements strongly suggested that 264 East Haverhill Street was the hub of his drug operation and, therefore, a natural place to store his drugs, records, and tools. For example,

- For the first controlled buy, he left the apartment complex nine minutes before he handed the undercover agent 30 grams of heroin at the Loop Mall in nearby Methuen, making it unlikely he stopped along the way.

- On March 27, 2015, the morning after discussing the two-kilo deal with Gonzalez-Arias, a co-conspirator pulled up to Gonzalez-Arias's building, told him to "[o]pen up," and left with a green bag.

- A few weeks later, Gonzalez-Arias told another cohort (who'd asked, "Is that ready?") that he was "making" two batches of heroin to fill an order, and that he was "coming," minutes before he emerged from the apartment building and drove to a rendezvous in a nearby parking lot.

- Lastly, about a month before the warrant issued, Gonzalez-Arias called his associate from that same East Haverhill Street building and arranged to pick up the first kilo of the ten-kilo Mexican shipment.

We've "repeatedly" found probable cause to search a defendant's home when agents spotted him "leaving the home immediately prior to selling drugs" elsewhere. United States v. Barnes, 492 F.3d 33, 37 (1st Cir. 2007). And in Rivera, even when the defendant stopped at a stash house before moving on to the deal, we found probable cause to search his apartment because he was "a long-time, high-volume drug dealer" and used the place "as a communications point to further his drug crimes" (he made calls from there to set up the deals). 825 F.3d at 64. As in Rivera and Barnes, that Gonzalez-Arias made his illicit business calls and processed the drugs at the East Haverhill Street building, often minutes before he handed them off to buyers and associates, suggested that he kept the ingredients, processing tools, and records there, along with the weapons to protect them.

Hoping to slice the baloney just thin enough, Gonzalez-Arias argues that even if the drug dealing traced back to 264 East Haverhill Street (a three-story, multi-unit building), there was "only the most tenuous evidence linking [him] to the apartment that was searched" (unit 18) "rather than just some unit" in that building. Moreover (he adds), by the time agents applied for the

warrant in July 2015, "the evidence of controlled buys had grown stale, with the most recent" one "happening over 7 months" earlier.

But neither claim cuts it. Four months before they asked for the warrant, agents overheard Gonzalez-Arias order a food delivery to 264 East Haverhill Street and tell the delivery person to buzz apartment 18. Maybe he was eating with a neighbor. But there was at least a "fair probability" that Gonzalez-Arias was ordering food from the same unit he used to stage his drug deals. Remember, the government need not make a beyond-a-reasonable-doubt or even a more-likely-than-not showing to establish probable cause for a search. See Rivera, 825 F.3d at 63; Feliz, 182 F.3d at 87.

As for the staleness issue, we've long recognized that drug trafficking operations on this scale take time to develop — they "often germinate over a protracted period of time" — so "information that might otherwise appear stale may remain fresh and timely during the course of the operation's progression." United States v. Tiem Trinh, 665 F.3d 1, 14 (1st Cir. 2011) (citing United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996)). Well-networked, well-sourced, and well-settled drug peddlers like Gonzalez-Arias aren't likely to close up shop (and toss all the goods, papers, and tools in it) just a month after ordering ten kilos of product. Gonzalez-Arias's drug calls and related trips from his home base right up to the month before the warrant issued were fresh evidence that the illicit items remained in the flat.

See Feliz, 182 F.3d at 87 (where two controlled buys three months before warrant issued weren't stale, given that defendant's drug operation was "continuous and ongoing").[4]

For those reasons, the district court did not err when it denied the motion to suppress.

## GUILTY PLEA

### Background

After the judge refused to suppress the trove of evidence found in Gonzalez-Arias's apartment, his attorney (still Gleason) began plea talks with the government. By January 2017, the lawyers had drafted a plea agreement, and the judge scheduled a "Rule 11" (read: guilty plea) hearing. But when the time came (at the hearing on Thursday, January 5, 2017) Gonzalez-Arias was not prepared to sign it. Gleason relayed that his client "wishe[d] to plea, but he believe[d] that the weight of the drug that's involved in this case" was "one to three kilos," and not "as high as 3.9

---

[4] The DEA affidavit also alleged probable cause to believe Gonzalez-Arias was violating the immigration laws and secreted "birth certificates and other identity documents" in his residence. Gonzalez-Arias also complains, for the first time on appeal, that the affidavit did not show probable cause that incriminating immigration paperwork would be found in the apartment, or provide any basis to search for storage unit or real estate records (which were also sought). Since he does not identify any "good cause" to consider these unpreserved grounds for suppression, we don't consider them. See Fed. R. Crim. P. 12(c)(3).

kilos," as the government argued.  The drug weight claim, Gleason said, was Gonzalez-Arias's "sole contention."  "But he would be willing to plea" if the government agreed the drug weight was 1-3 kilos.[5]  So the judge proposed to postpone the hearing until the following Monday to let the parties think it over.

But before the hearing ended, Gonzalez-Arias (through Gleason) told the judge "that he ha[d] not seen the evidence, and he want[ed] more time to be able to review [it]."  Well (he clarified), the government gave all the evidence to his lawyer, and he'd seen most of the paper (like the reports from the lab testing the drugs, the drug ledgers recovered from his apartment, and the police reports).  But he hadn't seen those caught-on-camera moments — the surveillance video of his two hand-to-hand drug deals with the undercover agent, or of him and his co-

---

[5] "[A] defendant is responsible for drugs he personally handled or anticipated handling, and . . . for drugs involved in additional acts that were reasonably foreseeable by him and were committed in furtherance of the conspiracy." United States v. Sepulveda, 15 F.3d 1161, 1197 (1st Cir. 1993).  The drug weight for which the defendant is "responsible" in turn determines the "base offense level" used to fix his guideline sentence.  See U.S.S.G. § 2D1.1(c).  So if the court found at sentencing that Gonzalez-Arias handled, planned to handle, or should have foreseen his co-conspirators handling 3.9 kilos of drugs, his offense level would have been higher (32 levels) than if he was only accountable for 1-3 kilos (30 levels), raising his guideline range.  See id. And a higher guideline range might have affected Gonzalez-Arias's sentence.  See Gall v. United States, 552 U.S. 38, 49 (2007) (explaining that "[t]he Guidelines should be the starting point and the initial benchmark" for deciding the sentence).  Hence the hullabaloo.

defendant coming and going when the deals went down (captured on the camera mounted on the telephone poll outside his apartment). These were still being "processed" by the jail. Plus, he hadn't heard the audio recordings of the intercepted phone calls or read the transcripts of them. So the judge told Gleason to bring that evidence to the jail so Gonzalez-Arias could watch and listen. Gleason pledged to do so that weekend.

But he didn't follow through. At the hearing that Monday, Gleason reported that he'd been "unable to get [the evidence] put together for Sunday," when he'd visited the jail, so Gonzalez-Arias still hadn't reviewed the tapes. Gleason added that he had, however, talked the government down to 1-3 kilos of drug weight, sweetening the plea agreement. At first, Gonzalez-Arias still wasn't having it. When Gleason finished giving the judge updates, Gonzalez-Arias passed him a letter and asked Gleason to read it to the judge. In it, Gonzalez-Arias protested that his prior lawyer had advised him he was only on the hook for 850 grams (putting him below the one-kilo trigger for the ten-year mandatory minimum). When Gleason finished reading the letter aloud, he corrected his client: in fact (he reminded), agents found two stashes of heroin (around 600 grams in a coffee bag and 680 grams in plastic zip-lock bags) in Gonzalez-Arias's apartment. And he'd shown Gonzalez-Arias the lab reports that showed those weights. To confirm, he pulled both reports from his briefcase and showed

them to Gonzalez-Arias in court. Meanwhile, the government told the judge (and the defense) that it would withdraw the plea deal and "seek[] to prove in excess of three kilograms of heroin against the defendant" unless he pled that day. With the drug reports in front of him, and the government's plea offer about to lapse, Gonzalez-Arias relented; he told the judge that he wished to plead guilty.

Once Gonzalez-Arias made his choice, the judge moved on; he described the charges, their elements, the possible penalties (including the ten-year minimum and twenty-year maximum under the plea agreement), Gonzalez-Arias's trial rights (which he'd give up by pleading guilty), the plea agreement, and the sentencing process. And he told Gonzalez-Arias he could not "withdraw [his] plea of guilty" if he got "a sentence that [was] longer than [he] expect[ed]." Gonzalez-Arias said he understood. The government then summarized the evidence against him, telling the story of the "long investigation," using "telephone intercepts, pole camera surveillance, and physical surveillance," that caught Gonzalez-Arias "discussing" and "entering" multiple drug deals. Gonzalez-Arias admitted that was true. He was "pleading guilty because [he] was] in fact guilty," he agreed. And he did so "freely and voluntarily." By the way, he was "fully satisfied" with Gleason's work.

A few months later, Gonzalez-Arias changed his tune. In a March 24, 2017 letter to the judge, he wrote that he was dissatisfied with Gleason's work and asked to have his first lawyer (William Fick) back.[6] While that request was pending (on March 27, 2017), all the evidence in the case (including the tapes) arrived at the jail, and Gonzalez-Arias had watched and listened to it within a week.

The judge held a prompt (March 29, 2017) hearing to discuss the request for new counsel. After talking with his client, Gleason elaborated that Gonzalez-Arias thought that Gleason "ha[d]n't been able to do anything for him" and "that the ten-year minimum mandatory [was] something that he could have gotten himself." The judge told him he couldn't appoint Fick, who was now in private practice, but (finding Gonzalez-Arias indigent) he agreed to appoint another lawyer from the federal public defender's office, Timothy Watkins.

Seven more months passed. In the interim, Watkins changed jobs, and a third public defender, Scott Lauer, took over as lead counsel with a research and writing attorney, Samia Hossain, as co-counsel.

---

[6] In his letter, Gonzalez-Arias complained that Gleason hadn't communicated with him since he'd pled guilty two months prior, had given him "misleading information," and cited mostly Massachusetts cases in his motion to suppress, even though "[f]ederal law governs the admissibility of evidence in federal prosecutions," United States v. Charles, 213 F.3d 10, 19 (1st Cir. 2000).

- 15 -

About two weeks before his scheduled sentencing, Gonzalez-Arias (through Lauer and Hossain) moved to withdraw his guilty plea. He argued that his plea hadn't been knowing or intelligent because he hadn't seen or heard the surveillance tapes when he pled. And without them, he couldn't "reconcile the varying accounts he had received" from his lawyers "regarding the drug weight." Moreover (he said), the plea hadn't been voluntary. The government had threatened to take the deal off the table if he didn't plead guilty by the end of the day. And given the government's impatience, Gleason had urged him to cop. Pressured from both sides, Gonzalez-Arias "felt compelled" to plead guilty without hearing or seeing the recordings. What's more, he added, Gleason's failure to share the evidence "even after repeated instructions from th[e] [c]ourt," and his failure to "press the government" for more time to do it, constituted ineffective assistance of counsel.

After a hearing, the judge denied the motion. First, he found that "no one threatened" or "coerced" Gonzalez-Arias to plead guilty. He'd admitted as much under oath, and the government had the right to time-limit its plea offer. Second, after "a careful and lengthy colloquy," Gonzalez-Arias had sworn he understood the charges, their elements, his trial rights, the plea agreement, the ten-year minimum and twenty-year maximum, and the other consequences of his conviction. In fact, "[h]e focused like a

- 16 -

laser on the drug weight," showing he "underst[ood] that greater-than-one kilogram meant at least ten years in jail." He'd also understood the evidence. He'd heard and agreed to the government's summary of it. And "the mere fact, if it [was] a fact, that he did not personally review all of [that] evidence" beforehand did "not undermine" the plea. Even after he reviewed all of the discovery with his new counsel, "[n]owhere in his [motion to withdraw] d[id] he identify anything specific in the discovery . . . that [was] causing him to want to withdraw his plea." Based on all that, the judge found that there was "no fair and just basis under Rule 11 [to allow Gonzalez-Arias] to withdraw the plea."

Gonzalez-Arias now appeals that decision, which we review for abuse of discretion. See United States v. Pellerito, 878 F.2d 1535, 1538 (1st Cir. 1989).

## Law

A defendant has no "absolute right" to take back his guilty plea before sentencing. United States v. Caramadre, 807 F.3d 359, 366 (1st Cir. 2015). Instead, he must persuade the trial court that there's a "fair and just reason for requesting the withdrawal." Id. (quoting Fed. R. Crim. P. 11(d)(2)(B)). This depends on several factors. Most critically — since a guilty plea waives a slew of rights (to remain silent, to have a jury trial, and to confront accusers) — it must be voluntary, knowing, and

intelligent.  See United States v. McDonald, 121 F.3d 7, 11 (1st Cir. 1997); see also Boykin v. Alabama, 395 U.S. 238, 243 n.5 (1969).  These "core concerns of [Federal Rule of Criminal Procedure] 11" are "the most important factors to consider" on a motion for plea withdrawal.  United States v. Isom, 580 F.3d 43, 52 (1st Cir. 2009); see also United States v. Allard, 926 F.2d 1237, 1244 (1st Cir. 1991) (explaining that the Rule 11 procedure aims to ensure that the defendant understands the charge and the consequences of the plea).  The other factors are the defendant's reasons for withdrawal; the timing of the request; whether he credibly claims innocence; and whether unwinding the plea would be unfair to the government.  United States v. Gates, 709 F.3d 58, 68-69 (1st Cir. 2013).  The judge may also factor in whether there was a "plea agreement" that "gained something for the defendant." United States v. Aker, 181 F.3d 167, 170 (1st Cir. 1999).

**Application**

On appeal, Gonzalez-Arias urges that the judge should have let him withdraw the guilty plea for two reasons.  We'll take each in turn.

*a.  Ineffective Assistance of Counsel*

First, he urges, as he did below, that he pled guilty without the effective assistance of counsel (and therefore involuntarily) since Gleason failed to bring him the video/audio evidence before the government's plea-deal offer lapsed.

- 18 -

Defendants making such a claim — "that deficient legal representation contributed to their 'mistaken' guilty pleas" — must "meet the accepted tests for ineffective assistance [of counsel] before being allowed to withdraw pleas on this basis." Pellerito, 878 F.2d at 1537–38. So Gonzalez-Arias needed to show that Gleason's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for [Gleason's] error[ ]" (*i.e.*, if he'd shared the surveillance evidence on time), Gonzalez-Arias "would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 57–59 (1985) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).

Even if Gleason's slip-up was constitutionally deficient (and we don't decide if it was), Gonzalez-Arias's ineffective assistance claim fails at the second step; there's no "reasonable probability" that he would've turned down the plea deal if he'd seen and heard the surveillance tapes and recordings earlier. Thinking rationally (and no one suggests he wasn't), he had to understand he'd likely lose at trial (the judge and prosecutor explained the trove of evidence — including the surveillance footage, and the stash in his apartment — and Gleason showed him the lab reports spelling out drug types and weights more than once before he pled guilty). And if the jury did convict, he'd face an 80-months-higher guideline prison sentence than he'd face if he

- 19 -

pled guilty.[7]  That explains why, at the first (aborted) Rule 11 hearing, he said he "wishe[d] to plea[d]" guilty and was only hung up on the drug weight.  The revised plea deal, which he signed the next week, gave him the only thing he held out for:  the government agreed to the 1-3 kilo weight.  See U.S.S.G. § 2D1.1(c)(4).  And the surveillance offered no reason to think he could do better.  Far from an ace in the hole for the defense, the tapes featured him quarterbacking two- and ten-kilo drug deals — evidence the government could have used to get a higher sentence.  See id. (increasing the defendant's guideline sentence if he was responsible for over three kilos of heroin).  Hearing the tapes firsthand would not have emboldened Gonzalez-Arias to throw a Hail Mary pass at trial; most reasonably, it would have stiffened his resolve to plead guilty.

Gonzalez-Arias's brief on appeal gives us no reason to think otherwise.  As before the district judge, he doesn't say

---

[7] This is because if he pled guilty, Gonzalez-Arias would receive at least two points off his offense level for acceptance of responsibility (and another point off if his plea was "timely"); so his offense level would have been two or three points higher if he went to trial.  See U.S.S.G. § 3E1.1.  The government predicted that these three extra points would raise his guideline sentence by about 80 months.

In addition to the 80-month guideline hike, the government had talked about trying to enhance Gonzalez-Arias's sentence based on his prior convictions, see 21 U.S.C. §§ 841(b)(1)(A), 851, and adding a charge based on the loaded gun found in his apartment, see 18 U.S.C. § 924(c), if he pressed on to trial.

what in the recordings made him regret pleading guilty.  On the other hand, the government urges that it was the presentence report (or PSR for short), and not the audio-video evidence, which caused his about-face.  The PSR recommended that the judge find Gonzalez-Arias responsible not for 1-3 kilos, but for 4.2 kilos of heroin.  That might explain why, although Gonzalez-Arias saw all the evidence by April 2017, he didn't move to withdraw his plea until after the PSR came out months later.  But as we've said before, an unfavorable PSR is not a strong reason to let a defendant withdraw his plea.  See United States v. Santiago Miranda, 654 F.3d 130, 139-40 (1st Cir. 2011) (where we found that the "timing" of the defendant's plea withdrawal request, made two months after he pled guilty and only after he got an "unfavorable PSR," "suggest[ed] that it was a recalculation of risks and benefits — not involuntariness — that produced [his] change of heart").  We need not embrace the government's "the PSR made him do it" theory, and the district court made no finding on the matter.[8]  But whatever the reason Gonzalez-Arias changed his mind, he hasn't shown that it was, in fact, the surveillance tapes that caused the change —

---

[8] Rather, the judge later explained that the timing of Gonzalez-Arias's motion was not a game-changer in his decision, given that the transition between Watkins and Lauer (Watkins "probably was unwinding from his cases and trying to transfer them, rather than . . . working 100 percent on the case[ ]" and Lauer needed "time to get up to speed on it") may have delayed the filing of the motion.

and that's fatal to his ineffective assistance claim.  See Hill, 474 U.S. at 57–59.

### b.  Plea Colloquy

As his second attack on the guilty plea, Gonzalez-Arias takes issue with the judge's Rule 11 colloquy.  He argues that when he pled guilty, he believed "that he could withdraw his plea" if anything in the audio/video evidence changed his mind.  He says that the "Rule 11 colloquy[ ] fail[ed] to correct that mistaken belief" because the judge "fail[ed] to mention anything about the consequences of seeing the undisclosed discovery."  The government counters that "nothing in the record supports Gonzalez-Arias's claim that he believed he could withdraw from the plea after seeing all of the evidence or otherwise misunderstood the consequences of the guilty plea."

We wouldn't go quite as far as the government.  There's some suggestion in the transcript that Gonzalez-Arias was confused by the way the Rule 11 colloquy started off.  After the judge explained that he didn't have to plead guilty, Gonzalez-Arias said, "That's fine.  I will plead.  Then I'll have to go over the evidence, have them bring the evidence to me.  I have pled guilty without seeing the evidence."  Then his lawyer interjected:

> **Mr. Gleason**:  Your honor, as I've indicated, I will be there [at the jail] tomorrow, with everything. And what I --

>    **The Court**:  I guess I have this question for your client.  Yes or no, today you wish to plead guilty?
>
>    **Mr. Gonzalez-Arias**:  Yes, Your Honor.
>
>    **The Court**:  All right.  I'll ask you the questions.  Either way, I'm directing you, Mr. Gleason, to go there again tomorrow to provide the information.

Later, when the judge was warning Gonzalez-Arias about the consequences of his plea, Gonzalez-Arias hinted at confusion again:

>    **The Court**:  Do you understand that you will not be permitted to withdraw your plea of guilty if your sentence is longer than you expected, if you're unhappy with your sentence, or if it's different from any sentence your lawyer might have predicted?
>
>    **Mr. Gonzalez-Arias**:  Do you mean I will not be allowed to withdraw my plea? I didn't --
>
>    **The Court**:  You cannot withdraw your plea of guilty because you get a sentence that's longer than you expect.
>
>    **Mr. Gonzalez-Arias**:  Okay.
>
>    **The Court**:  Or because you're unhappy with your sentence.
>
>    **Mr. Gonzalez-Arias**:  Okay.
>
>    **The Court**:  Or because your sentence is different than your lawyer might have predicted.
>
>    **Mr. Gonzalez-Arias**:  Okay.

Gonzalez-Arias urges that "[b]y cutting him off and only listing three specific circumstances in which his plea could not be

withdrawn, the court left open the door to Mr. Gonzalez-Arias's mistaken belief that he could withdraw [his plea] upon seeing the evidence."

However, Gonzalez-Arias makes this argument for the first time on appeal; his motion below took no issue with the judge's plea colloquy. So he must show an error that was "plain — that is to say, clear or obvious," "affected [his] substantial rights," and "seriously affects the fairness, integrity or public reputation of judicial proceedings." Rosales-Mireles v. United States, 138 S. Ct. 1897, 1904-05 (2018). In the guilty plea context, the defendant "must, in order to demonstrate that his substantial rights were affected, show a reasonable probability that, but for the error, he would not have entered the guilty plea." United States v. Figueroa-Ocasio, 805 F.3d 360, 368 (1st Cir. 2015) (cleaned up). Since Gonzalez-Arias doesn't address whether the judge's (alleged) colloquy error met the last three prongs of plain error review, his argument about it is waived. See United States v. Severino-Pacheco, 911 F.3d 14, 20 (1st Cir. 2018). Anyway, he couldn't meet the third prong for reasons we've already explained: even if Gonzalez-Arias hadn't seen the video/audio evidence before he pled guilty, and even if he thought he could change his mind once he reviewed it, the supposedly unseen evidence undoubtedly would not have prompted Gonzalez-Arias to proceed to trial. So there's no "reasonable probability" that

"but for the error" he would have gone to trial.  Figueroa-Ocasio,

805 F.3d at 368.

## SIXTH AMENDMENT CLAIMS

### Background

The day after the judge shot down the attempt to withdraw

the plea, Lauer and Hossain wrote the judge that there'd been a

"substantial breakdown in the attorney-client relationship" and

asked to withdraw as Gonzalez-Arias's lawyers so the judge could

appoint a new one.  The judge held a hearing on the motion two

days later.  At the start, the judge excused the government from

the room so Gonzalez-Arias and his attorneys could speak freely

about their private communications.  After the government left,

Gonzalez-Arias complained that Lauer had refused his request to

appeal the plea decision before sentencing.[9]  The judge, however,

was unimpressed.  He explained that Lauer's refusal was reasonable

("if not an indisputably . . . correct judgment"), since he

couldn't appeal the plea decision before the end of the case.  And

even if Lauer "responded negatively" about Gonzalez-Arias's "idea

of withdrawing the guilty plea," he was just being honest:  it was

---

[9] As Lauer and Gonzalez-Arias described them, the alleged attorney-client issues were mainly between Gonzalez-Arias and Lauer, who (as we said before) was lead counsel — the one meeting with Gonzalez-Arias and making the key tactical decisions in the case (like moving to withdraw the plea).  But Lauer and Hossain worked as a team, both moved to withdraw as counsel, and Gonzalez-Arias made clear he wanted to discharge both.

- 25 -

a "hard motion" and not "a slam dunk." So the judge had no "concern . . . that the federal defenders" were providing "anything less than zealous advocacy" (he called their plea-withdrawal motion "superbly done," "well documented," "well researched," and "an excellent piece of craftsmanship") and spied no issue that "would prevent [Gonzalez-Arias and his] lawyers from working together in this case." That all said, the judge denied the motion for new counsel.

A week later, though, Gonzalez-Arias went rogue; he appealed the guilty plea decision himself — an appeal which, sure enough, we later dismissed for lack of appellate jurisdiction. See United States v. Gonzalez-Arias, No. 17-1245 (1st Cir. Dec. 29, 2017); United States v. Aliotta, 199 F.3d 78, 83 n.3 (2d Cir. 1999) ("Motions to withdraw guilty pleas are not among the 'small class' of motions immediately appealable in criminal cases."). So eighteen days before the scheduled sentencing, Lauer and Hossain renewed their motion to withdraw. The judge held another ex parte hearing the day before the scheduled sentencing. Buckle up — it was a long one — but the details matter. As we'll explain, we pay close attention to Gonzalez-Arias's reasons for wanting new counsel, the judge's inquiry into those reasons, his warnings about going pro se, and whether Gonzalez-Arias "unequivocally" decided to do so. See United States v. Kar, 851 F.3d 59, 65–67 (1st Cir. 2017).

First, Lauer updated the court: Gonzalez-Arias "ha[d] lost confidence" in him and suggested he was "colluding with the prosecution." Speaking for himself, Gonzalez-Arias added that he and Lauer did not "see eye to eye on the situation" and that he didn't "want [Lauer] to have anything more to do with [his] case." Asked why he and Lauer weren't "getting along," Gonzalez-Arias said that they could never agree: he'd tried to show Lauer holes in the government's case against him, but Lauer responded that he'd already "signed the plea" and "c[ouldn't] do anything more now." Since all they "did was argue about the plea," they hadn't had time to review the PSR.

The judge didn't buy it. First, he reminded Gonzalez-Arias that Lauer had, in fact, filed the motion to withdraw the plea, and that the judge had denied it. He told Gonzalez-Arias that based on "the history in this case" (Gonzalez-Arias's issues with his previous lawyers), he was "not likely to appoint another lawyer to represent [him]." So Gonzalez-Arias could either stick with Lauer and Hossain or, the judge said, "there's the possibility that you could represent yourself." The judge then explained the implications of going pro se. "What's left in your case before me is this: your sentencing," he began. He had already explained how sentencing (and the guidelines) worked before Gonzalez-Arias pled guilty. Now, he reviewed what would happen at the sentencing hearing: that "whether [he was] represented by counsel or not,"

Gonzalez-Arias and the government could object to the PSR, the judge would "resolve . . . every objection that's made," and after that, he would "hear arguments about what's the appropriate sentence."

While on that topic of sentencing, the judge followed up on the PSR issue. Lauer confirmed that the "breakdown in communication [had] prevented a serious conversation about [the PSR]," though after more questions, he clarified that Gonzalez-Arias had "reviewed the [PSR] independently" and pointed out "certain things" he disagreed with.

Then, they had this exchange:

**The Court**: All right. So Mr. Gonzalez-Arias, the first question is . . . do you wish Mr. Lauer and Ms. Hossain to continue as your lawyers, or not? What do you want as to them?

**Mr. Gonzalez-Arias**: Now, do you want to know what my objections to continuing with them [sic], or do you want to know why I want to do it alone?

**The Court**: I want to know whether you want them as your lawyers or not.

**Mr. Gonzalez-Arias**: No, I do not want them, definitely.

**The Court**: All right. If I discharge them as your lawyers, do you want to represent yourself, or are you asking me to appoint another lawyer?

**Mr. Gonzalez-Arias**: I do not want to represent myself.

Gonzalez-Arias then rehashed his issues with prior lawyers.  But the judge repeated that he was "not going to appoint a new lawyer for [Gonzalez-Arias]."  In his view, the problem was not that Gonzalez-Arias was "oil and water with one particular lawyer" — many of the "issues [he] raise[d] relate[d] to earlier lawyers [he] had," and they would not be "fixed by having another lawyer." Rather, the problem was that Gonzalez-Arias was "not listening to Mr. Lauer," and granting the request would only delay sentencing. As the judge later explained, "If I appoint a new lawyer, I can't proceed with sentencing tomorrow.  I have to give that lawyer some reasonable period of time to read the [PSR] and talk to Mr. Gonzalez-Arias, and to then file objections with the Court."

So the judge gave Gonzalez-Arias three choices:  (a) he could hire his own lawyer; (b) he could discharge Lauer and Hossain and "represent[ ] yourself" with them as "standby lawyers" (he confirmed that Gonzalez-Arias knew what that meant); or (c) he could "proceed with them as [his] lawyers."

> **Mr. Gonzalez-Arias**:  Could it be option (d)?
>
> **The Court**:  What's (d)?
>
> **Mr. Gonzalez-Arias**:  Appoint me another lawyer, Your Honor.
>
> **The Court**:  You can ask for (d), yes.  And I give you kudos, you'd be a good lawyer.  Because even though I've told you that I'm not appointing another lawyer, you came back to me and asked again.

> **Mr. Gonzalez-Arias**: Right.
>
> **The Court**: And the answer is, no, I'm not appointing another lawyer. And let me explain why. You're entitled to know why.

Elaborating, the judge added that the "timing of th[e] request" showed "gamesmanship" by Gonzalez-Arias to delay the case and avoid facing his sentence. He repeated that the problem was not with Gonzalez-Arias's lawyers, who had been "excellent," but with Gonzalez-Arias, who simply didn't agree with their advice.

So (the judge continued) "[t]he question is how do you want to proceed? With them as standby counsel, sitting there next to you, or do you want them to be your lawyers?" He'd explained that "it's not a good idea to represent yourself" because "[t]he law is complicated, and there are a lot of rules. And you're not familiar with those rules." "And you can get good advice from people who are lawyers . . . and generally, it's not wise for defendants to represent yourself." "So you know, there's an expression in America you may have heard: The person who has himself for a client, has a fool for a lawyer." Gonzalez-Arias responded:

> **Mr. Gonzalez-Arias**: It's a tough situation, Your Honor, because, yeah, I didn't want them as counsel, but I was expecting to get another lawyer, because I'm not a lawyer, I don't know the law. I don't know the argument I'm going to make here about my case as a lawyer, because I don't know the law. So I'm in a tough situation. I'm pretty much pushed

to really keep them on my case, so they can make the argument, whatever they can make.  . . .

**The Court**:  Well if you want, you can do this:  You can discharge them, have them as standby.  [The Court explained again how sentencing, objections, and the guidelines worked.] And you could either have them tell you what objections they think that you ought to make . . . or you could have them make it on your behalf, even though they're standby.

. . .

Why don't we proceed that way.  That way you're in charge, and they can do as much or as little as you want them to do.  And your objection to my not appointing you a new lawyer is preserved; that is, that means that by proceeding the way I've just described, you're not waiving any rights that you have to complain about my decision to not give you a new lawyer.  Do you understand?

**Mr. Gonzalez-Arias**:  Yes, sir.

**The Court**:  Okay.

**Mr. Gonzalez-Arias**:  That's fine.

After that 45-minute conversation, the judge called the government back in and explained what happened.  "It would be fair to say," he said, "that Mr. Gonzalez-Arias is very committed to his position . . . that he would like Mr. Lauer and Ms. Hossain to be discharged from representing him . . . and that he does not wish to proceed pro se [and] wishes me to appoint him a new lawyer"; but since there wasn't good cause to appoint new counsel, "the best way to proceed [was] they [Lauer and Hossain] should be discharged and serve as standby counsel."  So Gonzalez-Arias was

- 31 -

now "representing himself."  Though given the chance to weigh in ("**The Court**:  So is there something that you wish to raise before these proceedings conclude today?"), Gonzalez-Arias took no issue with the judge's summary and only asked for more time to prepare for sentencing.  At the government's urging, the court granted a three-week continuance to give Gonzalez-Arias more time to prepare.

When the time came for sentencing, the judge recapped that "[a]t [Gonzalez-Arias's] request that [he] didn't want Mr. Lauer to represent [him] anymore, [the judge had] discharged [Lauer] as [his] lawyer" and "directed that he be standby counsel." And Gonzalez-Arias proceeded to represent himself at the hearing. But he conferred with Lauer, and when requested, the lawyer chimed in at various points:  first, to argue that the judge should not increase the guideline range based on the gun found in Gonzalez-Arias's apartment (since "the firearm . . . ha[d] not been connected to Mr. Gonzalez-Arias by way of any forensic evidence, fingerprints, DNA, or the like," and the surveillance never caught him carrying it), and second, to argue for a sentence at the mandatory minimum (reviewing Gonzalez-Arias's background and potential "to work, to teach, to coach [baseball] in the Dominican Republic").

Gonzalez-Arias distills two Sixth Amendment claims from this episode.  First, he urges, the judge violated his right to effective assistance of counsel by refusing to appoint him a new lawyer despite his "legitimate concerns" about Lauer and Hossain, who "refused to listen to or take the time necessary to understand his [unspecified] complaints" about his case.  Second, he never said he waived the right to counsel, and even if he had, his exchange with the judge (called a "colloquy") "was insufficient to ensure that [any] waiver of the right to counsel was voluntary, knowing, and intelligent," as the Constitution requires, so the court should not have let him go pro se (even with his lawyers on standby).

We review for abuse of discretion the judge's decisions not to appoint new counsel and to let Gonzalez-Arias handle his sentencing pro se.  Kar, 851 F.3d at 65-66.  But like his other claims, Gonzalez-Arias's Sixth Amendment issues don't wash.

### a. Motion for New Counsel

The Sixth Amendment "guarantee[s] an effective advocate for each criminal defendant" but not always "the lawyer whom he prefers."  Id. at 65 (quoting Wheat v. United States, 486 U.S. 153, 159 (1988)).  So — while a judge can't thrust the defendant into a trial (or here, a sentencing hearing) "with incompetent or unprepared counsel," Maynard v. Meachum, 545 F.2d 273, 278 (1st

Cir. 1976) — courts may sometimes "force criminal defendants to choose between effective representation by unwanted counsel and proceeding pro se," Kar, 851 F.3d at 65. For example, the judge may refuse an untimely request for a new defender (even when the accused can pay for one) if granting it would needlessly delay the proceedings. See United States v. Woodard, 291 F.3d 95, 106–07 (1st Cir. 2002); Tuitt v. Fair, 822 F.2d 166, 172 (1st Cir. 1987) ("A last-minute request to substitute counsel should not be allowed to become a vehicle for achieving delay." (internal quotation marks omitted)); Maynard, 545 F.2d at 278 ("A court need not tolerate unwarranted delays, and may at some point require the defendant to go to trial even if he is not entirely satisfied with his attorney."). When a defendant asks for new appointed counsel, the judge must "conduct an appropriate inquiry into the source of the defendant's dissatisfaction" with his current defenders. United States v. Myers, 294 F.3d 203, 207 (1st Cir. 2002) (citing United States v. Allen, 789 F.2d 90, 92 (1st Cir. 1986)). That a defendant comes to distrust his lawyer isn't enough to justify appointing a new one; he "must provide the court with a legitimate reason for his loss of confidence." Allen, 789 F.2d at 93.

To see if the judge abused his discretion (as alleged here) in denying the request, we consider three main factors: "(1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the defendant's complaint; and (3) whether the

conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense." United States v. Mejía-Encarnación, 887 F.3d 41, 47 (1st Cir. 2018) (quoting Kar, 851 F.3d at 65); see also Allen, 789 F.2d at 92.

Regardless of whether Gonzalez-Arias's motions to substitute counsel were timely, the judge did not abuse his discretion in denying them. His probe into Gonzalez-Arias's problems with Lauer and Hossain was patient and searching; confronting vague complaints (that there was a "substantial breakdown in the attorney-client relationship," and that Gonzalez-Arias thought Lauer was in cahoots with the government) the judge dug deeper, asked both Lauer and Gonzalez-Arias about their talks, and sussed out the real issues: first, that Lauer had refused to file a mid-case appeal of the guilty plea decision, and second, that Lauer was too dismissive about Gonzalez-Arias's bid to withdraw his guilty plea initially and wouldn't keep discussing the issue after the judge ruled on it. The judge found that the resulting difficulty communicating had at most sidetracked (but didn't prevent) discussion of the PSR and sentencing issues. We've found that similar inquiries were enough to smoke out the true reasons the defendant wanted new counsel and decide if they merited a change. See Allen, 789 F.2d at 93 (finding court's inquiry "comprehensive" when it "invited appellant to make a statement,

listened to his reasons for being dissatisfied with his counsel, and found them to be without merit").

As the district judge found, Gonzalez-Arias's complaints boiled down to this:  Lauer gave his honest (if grim) assessment of the plea-withdrawal motion and wouldn't file a clearly premature appeal.  But straight-talk doesn't make a lawyer deficient; rather (as the judge explained below), it equips a defendant to make clear-eyed decisions.  And lawyers don't need to "waste the court's time with futile or frivolous motions" to be effective advocates. See United States v. Hart, 933 F.2d 80, 83 (1st Cir. 1991) (quoting United States v. Wright, 573 F.2d 681, 684 (1st Cir. 1978)).  So as we've repeatedly observed, a defendant isn't entitled to swap appointed counsel just because he dislikes his current lawyers' "accurate assessment of [his] predicament" or disagrees with their reasonable tactical decisions not to file frivolous papers. United States v. Francois, 715 F.3d 21, 29 (1st Cir. 2013) (that defendant "did not like hearing that the motions he wanted [his lawyer] to file were frivolous" and "that he would almost certainly be convicted and should accept a plea bargain" didn't justify appointing new counsel); see also Kar, 851 F.3d at 66 (affirming decision not to appoint new counsel for defendant who "simply disliked the substance" of his lawyer's advice); Woodard, 291 F.3d at 108 (finding that a lawyer's refusal to file a "motion that he

considered to be meritless" didn't warrant delaying trial so defendant could retain new counsel).[10]

True, the judge did find that Gonzalez-Arias and his lawyers had "difficulty" communicating. But "[a] defendant who seeks the replacement of appointed counsel must show more than the mere fact of a disagreement; he must show that the conflict between lawyer and client was so profound as to cause a total breakdown in communication, precluding the lawyer from effectively litigating the issues remaining in the case." Myers, 294 F.3d at 208. On appeal, Gonzalez-Arias does not contend that his conflict with Lauer crossed that line. Though Lauer did claim (at the hearing on his second motion to withdraw) that their conflict had "recently . . . prevented a serious conversation" about the PSR, Gonzalez-Arias does not press this point on appeal — perhaps because (as Lauer told the judge during the same hearing) Lauer and Gonzalez-Arias did discuss the report: Gonzalez-Arias reviewed it himself, identified portions he disagreed with, and shared those concerns with Lauer. See United States v. Pierce, 60 F.3d 886, 891 (1st Cir. 1995) (finding that defendant's "proof that his relationship with [his lawyer] was beset with problems"

---

[10] In case there's any doubt, we note that Lauer and Hossain's refusal to file a clearly premature appeal is a far cry from when a lawyer fails to file a *timely* notice of appeal. See Rojas-Medina v. United States, 924 F.3d 9, 12 (1st Cir. 2019). Lauer filed a timely notice of appeal after sentencing.

didn't require new counsel where the two "were conversing with one another and had some appreciation for the other's opinions and sensibilities at the time the motions were filed," so that "communication between the counsel and client was sufficient to allow a satisfactory defense"). Though Lauer believed their PSR discussion wasn't "finished," neither he nor Gonzalez-Arias identified for the judge anything they'd hoped to go over but didn't.

Rather, the judge reasonably found that Lauer and Hossain put up an "excellent" fight on the motion to withdraw the plea, even though they disagreed with it, and Lauer (conferring with Gonzalez-Arias) made several well-prepared arguments as standby counsel at sentencing. So Lauer and Hossain were "still able to adequately represent" Gonzalez-Arias "despite the alleged breakdown in communication." Mejía-Encarnación, 887 F.3d at 48. Their performance, and Gonzalez-Arias's history (he'd developed conflicts with at least three different lawyers), gave the judge good reason to find that any impediment came from Gonzalez-Arias's "own refusal to participate in his representation." Id. (finding new counsel uncalled for because Mejía's lawyer "fulfilled Mejía's request that he file motions to withdraw the guilty plea and to withdraw as counsel" and "zealously" argued for him at sentencing "despite the fact that Mejía was no longer cooperating with [counsel's] efforts to represent him"); see also United States v.

Reyes, 352 F.3d 511, 516 (1st Cir. 2003) ("[A] defendant cannot compel a change to counsel by the device of refusing to talk with his lawyer.").

On the other hand, as the district court found, appointing new counsel would have delayed sentencing again — likely more than just three weeks — since the new lawyer would need to read the PSR, review the evidence and case history, speak with Gonzalez-Arias, learn his history, listen to his concerns, file any objections, and prepare a sentencing argument. On balance, therefore, the judge did not abuse his discretion in denying the motions to withdraw and appoint new counsel. See Myers, 294 F.3d at 208 (upholding a similar decision because "the district court's ultimate conclusion — that no good cause existed for the appointment of new counsel and the concomitant delay in sentencing that such an appointment would entail . . . fell squarely within the realm of the court's discretion").

b. *Waiver of Counsel/Going Pro se*

Gonzalez-Arias urges that even if it was okay for the judge to limit his choices (to sticking with Lauer and Hossain or going pro se), he didn't unequivocally (as required) waive his right to counsel. And that's a serious claim; "the right to be represented by counsel is by far the most pervasive" of an accused's constitutional rights because it helps ensure he knows and can assert "any other rights he may have." United States v.

Cronic, 466 U.S. 648, 654 (1984).  So we must "indulge in every reasonable presumption" that Gonzalez-Arias did not mean to give it up.  United States v. Proctor, 166 F.3d 396, 401 (1st Cir. 1999) (quoting Brewer v. Williams, 430 U.S. 387, 404 (1977)).  That presumption only bends if the waiver was "'*clear* and *unequivocal*'; otherwise, a 'court should not deprive defendant of his right to counsel.'"  United States v. Betancourt-Arretuche, 933 F.2d 89, 92 (1st Cir. 1991) (quoting Tuitt, 822 F.2d at 174).  The waiver must also be "knowing, intelligent and voluntary."  United States v. Jones, 778 F.3d 375, 389 (1st Cir. 2015).  So before letting a defendant go on without counsel, the judge must warn the defendant "of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open."  Id. (quoting Faretta v. California*, 422 U.S. 806, 835 (1975)).  To waive counsel knowingly and intelligently, the defendant must understand "the seriousness of the charge and of the penalties he may be exposed to" and have "a sense of the magnitude of the undertaking," that is:  "an awareness that there are technical rules governing the conduct of a trial, and that presenting a defense is not a simple matter of telling one's story."  United States v. Robinson, 753 F.3d 31, 43 (1st Cir. 2014) (quoting Maynard, 545 F.2d at 279).

As Gonzalez-Arias points out, he told the judge up front that he "d[id] not want to represent [himself]," and he never said,

in so many words, that he "would waive his right to counsel." So in his view, his so-called waiver was equivocal at best. But we've already rejected a similar claim. In United States v. Kneeland, the defendant also said "he 'did not want to go pro se, but [did not] want to use [his lawyer].'" 148 F.3d 6, 11 (1st Cir. 1998). After the trial judge rejected his request for new counsel, he defended himself at trial (as Gonzalez-Arias did at sentencing). Id. On appeal, we found an unequivocal waiver "not because [Kneeland] ever stated, in so many words, that he did not want attorney representation, but because he explicitly dismissed his third court-appointed attorney in the face of ample warnings by the district court that he would not be provided a fourth appointed counsel." Id. at 12 (holding that "[a]though Kneeland initially stated that he 'did not want to go pro se, but did not want to use [his current lawyer],' his ultimate decision" to dismiss his attorney and present his case pro se "was an unambiguous expression of his preference").

As in Kneeland, Gonzalez-Arias disliked his options (and as the judge noted, it wasn't his "first choice" to go pro se). But his final decision was express and firm. To recap, Gonzalez-Arias stressed from the get-go that he didn't "want [Lauer] to have anything more to do with [his] case." Even after the judge said he was "not likely to appoint another lawyer" and explained the alternatives (stick with Lauer/Hossain, go pro se with them on

standby, or get rid of them altogether), Gonzalez-Arias confirmed

he did not want the first option: he "d[id] not want [Lauer and

Hossain], definitely." So after more dialogue, the judge proposed

that he take the second option ("discharge" his lawyers and "have

them as standby" counsel). Gonzalez-Arias said "[t]hat [was]

fine."

　　　　If it wasn't, he would have said so. The judge made

clear that Gonzalez-Arias could keep Lauer and Hossain as his

lawyers if he wanted. And as the judge observed, Gonzalez-Arias

pushed for what he wanted; earlier in the hearing, he'd asked

several times (even after the judge denied his request) for another

lawyer. Yet, when the judge rehashed the agreed-on plan (that the

lawyers be "discharged and serve as standby counsel"), reiterated

that Gonzalez-Arias was now "represent[ing] himself," and asked if

there was anything else he "wish[ed] to raise before th[e]

proceedings conclude[d]" that day, Gonzalez-Arias only requested

more time to prepare for sentencing (which he got). And when the

time came for sentencing, Gonzalez-Arias in fact represented

himself. His express agreement to go pro se, combined with his

unflinching follow-through, made his final choice unambiguous.

See Kneeland, 148 F.3d at 11-12; see also Maynard, 545 F.2d at

276-78 (finding in a habeas case that "while Maynard did not

affirmatively wish to represent himself, when given a clear choice

between proceeding with counsel already appointed or going pro

se," he presented his own case and therefore "elected the latter"; remanding for more evidence on whether waiver was knowing, intelligent, and voluntary).

Gonzalez-Arias's waiver of counsel was also voluntary. On appeal, he argues that given his problems with Lauer and Hossain, he had no practical choice but to take the helm himself. But since the lawyers continued to have meaningful discussions with Gonzalez-Arias and provide effective advocacy despite their rocky relationship with him, the judge's decision to impose the choice he did — between sticking with them and going pro se — did not "place[ Gonzalez-Arias] in a dilemma of constitutional magnitude." Maynard, 545 F.2d at 278 ("[A] refusal without good cause to proceed with able appointed counsel is a 'voluntary' waiver."); see also Francois, 715 F.3d at 28-29; Kneeland, 148 F.3d at 12-13. And though Gonzalez-Arias hints in passing that his waiver wasn't "knowing and intelligent" and the court's "detailed colloquy" was "insufficient," he never tells us why he thinks it so. We need not fill in the blank. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

And so, the judge did not abuse his discretion or violate the Sixth Amendment by making Gonzalez-Arias choose between his

current counsel or going pro se, or by letting Gonzalez-Arias represent himself at sentencing.

## SENTENCING

## Background

When all was said and done, the judge sentenced Gonzalez-Arias to 136 months in prison, the government's recommendation, and five years of supervised release. To get there, he started (as required) by calculating Gonzalez-Arias's sentencing guideline range. See Gall v. United States, 552 U.S. 38, 49 (2007) ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."); United States v. Chisholm, 940 F.3d 119, 130 n.7 (1st Cir. 2019) (explaining that courts derive a defendant's guideline range from his "offense level" and "criminal history category," and describing what those are). First, Gonzalez-Arias's total offense level was 30,[11] based on the 1-3 kilos of drugs found in his

---

[11] As we noted earlier, the guidelines set a base offense level of 30 if the defendant was responsible for 1-3 kilos of heroin, and a base level of 32 if the weight was 3-10 kilos. See U.S.S.G. § 2D1.1(c). At sentencing, the judge rejected probation's claim that Gonzalez-Arias was responsible for 3-10 kilos of heroin, set the weight at 1-3 kilos, and therefore arrived at the base level of 30. The judge also added a two-level enhancement for the loaded gun, but a two-level reduction for Gonzalez-Arias's "acceptance of responsibility" cancelled that out. Finally, the judge rejected the government's request to add more levels because (it unsuccessfully argued) Gonzalez-Arias played a "leadership role" in the drug operation. Thus, Gonzalez-Arias's total offense level stayed at 30.

apartment.  As for Gonzalez-Arias's criminal history category, the judge found it was III.  Though Gonzalez-Arias had only one prior conviction (a 2001 conviction in New York state court for criminal possession of a controlled substance in the second degree, see N.Y. Penal Law § 220.18), he had been given a serious sentence (three years to life), and he was still on parole (despite Gonzalez-Arias's argument to the contrary) when he committed the federal crimes.  That gave him five criminal history points:  three for the prior prison sentence, see U.S.S.G. § 4A1.1(a) (adding "3 points for each prior sentence of imprisonment exceeding one year and one month"), and two for committing the federal crime while on parole, see id. § 4A1.1(d) (adding "2 points if the defendant committed the instant offense while under any criminal justice sentence, including . . . parole").  Which put his guideline range at 121-151 months in prison.

On appeal (as he did below), Gonzalez-Arias objects to that five-point pile-up from the New York conviction.  First, he urges that although the New York court sentenced him to three years to life in prison, he "really served a six-month sentence," so (in his view) that prior sentence was only worth two points.  See id. § 4A1.1(b) (assigning only "2 points for each prior sentence of imprisonment of at least sixty days" but less than or equal to one year and one month).  Second, he says that his New York parole ended before he committed the federal crimes at issue here.  So as

he would have it, he had only 2 criminal history points, so his criminal history category was II (not III).  See U.S.S.G. ch. 5, pt. A (table).  That would have lowered his guideline range to 108-135 months.

## Law

"We review criminal sentences imposed under the advisory guidelines regime for abuse of discretion." United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013).  In doing so, we review the judge's interpretation of the sentencing guidelines de novo and his underlying factual findings for clear error.  Id. And we'll dub an error "clear" only when we have "a strong, unyielding belief" that the judge made a mistake.  United States v. Occhiuto, 784 F.3d 862, 868 (1st Cir. 2015).  Viewed under that lens, neither of Gonzalez-Arias's sentencing-related claims cuts ice.[12]

## Application

First, Gonzalez-Arias says he only served six months in a "shock incarceration program" for his New York conviction before

---

[12] The government thinks it's "doubtful whether Gonzalez-Arias raised these claims [about the sentencing guidelines] in sufficient detail below or on appeal to avoid plain error review," but maintains that the claims fail "under any standard of review." So we'll analyze Gonzalez-Arias's challenges to his assigned guideline range as if they were preserved. See United States v. Encarnación-Ruiz, 787 F.3d 581, 586 (1st Cir. 2015) ("When the government fails to request plain error review, we, and many of our sister circuits, review the claim under the standard of review that is applied when the issue is properly preserved below.").

being deported to the Dominican Republic — not the full three-year sentence imposed. See N.Y. Correct. Law § 865 (explaining that a "shock incarceration program" is "a program pursuant to which eligible inmates are selected to . . . serve a period of six months in a shock incarceration facility, which shall provide rigorous physical activity, intensive regimentation and discipline and rehabilitation therapy and programming"). Inmates in New York apply to the program after being sentenced. See id. §§ 865, 867; see also People v. Miller, 29 N.Y.S.3d 586, 587 (N.Y. App. Div. 2016) ("[T]he determination as to whether to accept any particular individual into [the shock incarceration program] lies within the authority of the [New York] Department of Corrections and Community Supervision [DOCCS for short], rather than the [sentencing] court."). As Gonzalez-Arias would have it, because he only served six months of his three-years-to-life sentence, the New York conviction only carried two points under § 4A1.1. Here, however, he overlooks that under the guidelines, a "sentence of imprisonment" is measured by "the maximum sentence *imposed*." U.S.S.G. § 4A1.2(b)(1) (emphasis added). So "criminal history points are based on the sentence pronounced, not the length of time actually served." Id. § 4A1.2 cmt. n.2. Since Gonzalez-Arias doesn't dispute that the New York court sentenced him to more than one year and one month in prison, the judge properly

added three points for the New York sentence. That Gonzalez-Arias was released earlier than that does not affect his score. Id.

Second, Gonzalez-Arias challenges the judge's determination, based on information in the PSR, that he was on parole for the New York offense when he committed the crime in this case. He urges that New York's Drug Law Reform Act (DLRA), passed in 2004 while he was in the Dominican Republic (after being deported), ended his parole before that, so he should not have received the two points under § 4A1.1(d) (again, adding "2 points if the defendant committed the instant offense while under any criminal justice sentence, including . . . parole"). In pertinent part, the DLRA "provided that felony drug offenders sentenced under the old [drug] law[s] may now be eligible . . . to obtain early termination of parole." People v. Utsey, 855 N.E.2d 791, 794 (N.Y. 2006). Specifically, it directed "the [New York] *division of parole* [to] grant termination of sentence after three years of unrevoked presumptive release or parole to a person" who, like Gonzalez-Arias, was "serving an indeterminate sentence for a class A [drug] felony offense." 2004 N.Y. Sess. Laws ch. 738 (amending N.Y. Exec. Law § 259-j(3-a)) (emphasis added).

But even assuming that this provision applied to a defendant who, like Gonzalez-Arias, was "released without any supervision and subject to a single condition — remaining out of th[e] [United States] — with which he did not comply," Tavarez v.

- 48 -

Dennison, 829 N.Y.S.2d 437, 439 (N.Y. Sup. Ct. 2006) (holding that the DLRA did not entitle such a defendant to have his parole terminated early), Gonzalez-Arias doesn't contend that the New York Division of Parole ever terminated his parole. In fact, he admitted at sentencing that he never contacted the Division when he returned to the U.S. in 2007. So he gave the district judge no reason to doubt probation's report in the PSR that, based on DOCCS records, his "parole ha[d] not been terminated" by the Division. See United States v. González, 857 F.3d 46, 61-62 (1st Cir. 2017) ("The defendant bears the burden of disputing the PSR's factual findings, and absent an objection '[ ]supported by countervailing proof,' the district court usually may accept the findings in the PSR without further inquiry." (quoting Occhiuto, 784 F.3d at 868)).[13] Accordingly, the judge did not clearly err in finding that Gonzalez-Arias committed his federal crimes while on parole and adding the two criminal history points under § 4A1.1(d) for that reason.[14]

---

[13] Gonzalez-Arias does not argue for an exception to this rule here.

[14] Gonzalez-Arias also says that his sentence was "substantively unreasonable," but in support, he just relies on his claim that the judge calculated a too-high guideline range based on his New York conviction arguments, and says the judge erred by failing to "explain [his] upward variance" from the correct (lower) range. This claim actually sounds in procedural error. See Gall, 552 U.S. at 51 (characterizing a "fail[ure] to adequately explain the chosen sentence — including an explanation for any deviation from the Guidelines range" as procedural error).

## CONCLUSION

For those reasons, we *affirm* Gonzalez-Arias's conviction and sentence.

---

Anyway, since we find that the judge calculated the right guideline range, Gonzalez-Arias's premise is wrong: the sentence wasn't an "upward variance." And since he doesn't give us any other reason to think his sentence was substantively unreasonable, we can stop there. <u>See</u> <u>Zannino</u>, 895 F.2d at 17.